Sean D. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–510.

District of Columbia Court of Appeals.

Argued Oct. 11, 1996.

Decided Dec. 12, 1996.

Joseph C. Metcalfe, Public Defender Service, with whom Allie Sheffield and James Klein, Public Defender Service, were on the brief, for appellant.

Eileen F. Sheehan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Patricia A. Riley, and Mark J. Ehlers, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

After a second jury trial arising as a result of charges made in a five-count indictment,[1] appellant, Sean[2] D. Williams, was found guilty of assault with a dangerous weapon (D.C.Code § 22–502 (1996 Repl.)), and acquitted of malicious disfigurement while armed (D.C.Code §§ 22–506, –3202 (1996 Repl.)). On appeal, Mr. Williams challenges, *inter alia,* the sufficiency of evidence, the propriety of instructions, and the admissibility of expert testimony. We do not address these issues at length because we agree with appellant that his conviction must be reversed because the trial court refused to admit into evidence the transcripts of inconsistent statements made at the first trial by the government's key witness.[3]

---

1. Subsequent to indictment, the government dismissed a charge of mayhem while armed (D.C.Code §§ 22–506, –3202 (1996 Repl.)), and one count of cruelty to children (D.C.Code § 22–901 (1996 Repl.)). In a first trial, a jury found appellant not guilty of a second count charging cruelty to children, and deadlocked on the assault and malicious disfigurement charges.

2. "Sean" is reported as "Shawn" in significant parts of the transcript.

3. The trial court supplemented the jury instructions on the assault with a deadly weapon charge by stating: "If you find that [Sean] Williams actually injured [Kamia] Williams by placing her in or under hot water you may find that [Sean] Williams assaulted the complaining witness or the victim in this case." Appellant contends the

modification of the jury instruction was reversible error because it permitted the jury to convict appellant even if it believed he accidentally or negligently caused Kamia's injuries. Appellant also argues that the trial court should have instructed the jury that the government was required to prove that appellant was aware that his manner of use of the water made it an instrument likely to cause injury. We have previously held that "[i]n evaluating the propriety of a court's instructions, the reviewing court must look upon the charge as a whole 'without selecting and comparing separate phrases for literal content.'" *Powell v. United States,* 485 A.2d 596, 601 (D.C.1984) (quoting *Carter v. United States,* 475 A.2d 1118, 1124 (D.C.1984)), *cert. denied,* 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985). We agree with the government that in

## I.

At trial, the government's evidence showed that appellant's five-month-old daughter, Kamia, was severely burned by hot water in the family upstairs bathroom. Kamia's nine-year-old brother, Mark, testified that when he awakened on a May morning, his five siblings were asleep in his mother's first floor bedroom. He saw appellant enter the bedroom and heard words exchanged when his mother asked appellant to "change the baby." He saw appellant take Kamia upstairs, and when he followed to get a glass from the kitchen, he noticed appellant running hot water from the tub in the bathroom. He could see "the steam coming up." Kamia was lying on a blanket in the living room.

Mark returned downstairs, but once again went upstairs where he noticed that appellant was no longer on that floor. Returning downstairs, Mark saw appellant go back upstairs. Shortly thereafter (at a time when only appellant and Kamia were upstairs), Mark heard Kamia scream. He sent his five-year-old brother Anthony upstairs to see what had happened. Anthony, and a then two-year-old sister ("Sha–Sha"), went upstairs followed by Mark. On the way up, Mark encountered appellant coming downstairs with the baby in his arms. Appellant showed the baby to her mother (Cathy Williams) who started screaming and called an ambulance.

The ambulance arrived within minutes. Emergency medical technicians found Kamia swaddled in a towel in the arms of appellant. The technicians wrapped the baby in a sterile sheet and transferred her to a more advanced ambulance unit which took her to Children's Hospital. There, Kamia was determined to have suffered second and third-degree burns covering her chest, buttocks, genital area, back, elbows, and left leg: in total, 39 percent of her body. A pediatrician at Children's Hospital testified that the burns appeared to be non-accidental.

## II.

During cross-examination, defense counsel attempted to impeach then-nine-year-old Mark Williams with his testimony from three months earlier at appellant's first trial (which resulted in a mistrial).[4] The focus of the inquiry centered upon the questions of whether Mark saw appellant take the baby upstairs and whether appellant was upstairs when the baby screamed. First, the defense questioned Mark about current testimony that he saw appellant carry the baby upstairs:

Q: You told us [today that] you saw Shawn [i.e., appellant "Sean" (reported in the transcript as "Shawn") ] take the baby from your mother's hands, right?

A: Yes.

Q: And you told us that you saw Shawn take the baby upstairs, right?

A: Yes.

Q: Now, you remember that there was— we were here a few months ago and had a trial, right?

A: Yes.

Q: And you testified, right?

A: Yes.

\* \* \* \* \* \*

looking upon the instructions as a whole the jury was sufficiently instructed on the elements of assault with a deadly weapon and the government's burden to prove appellant's criminal intent. In this regard, we caution that on any retrial care should be taken to avoid any instruction (or part thereof) from which a juror could infer that even an accidental placing of the child in scalding water would constitute assault with a dangerous weapon. *See Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Jackson v. United States*, 600 A.2d 90 (D.C.1991).

Appellant also claims the trial court erred in permitting the government's expert witness, Dr. Lavdena Orr, to state an opinion as to whether Kamia "sustained her injuries accidentally or purposefully." We disagree. Dr. Orr's expert medical testimony was beyond the ken of the average layperson, and greatly assisted the jury's understanding of an important issue at trial. *See Cohoon v. United States*, 387 A.2d 1098, 1100 (D.C.1978) (doctors properly permitted to testify "as to the nature and severity of the injuries, the type of force required to cause them, and whether the explanation given by the appellant was consistent with the required degree of force").

4. As noticed above, *supra* note 1, at the first trial, appellant was found not guilty on the count of cruelty to children. A mistrial was declared after the jury was deadlocked on the malicious disfigurement while armed and the assault with a dangerous weapon charges.

Q: Isn't it true that you were asked, and I'm referring to page 28 of the transcripts for October 29th for the benefit of Government counsel, line 14, question: "Did you see Shawn take the baby from your mother?" Answer: "No, sir."

A: Yes, sir.

Q: So you're saying that you didn't say this the last time you were here?

A: No.

Q: You never said that?

A: No.

\* \* \* \* \* \*

Q: Now, you were also asked, question: "Did you see Shawn take the baby upstairs?" Answer: "No, sir."

A: Yes, sir.

Q: So if somebody wrote that down here, they were wrong, correct?

A: Yes.

Mark was then cross-examined about his current testimony that appellant went upstairs shortly before Kamia began crying:

Q: Mark, you saw Shawn run upstairs after the baby started crying, didn't you?

A: No, I didn't. Let me see that book.

Q: Okay. Mark, the last time you were here—I'm going to turn to page 32 at line 4. This is so Ms. Riley can read it, too—

A: Yes.

Q: Question: "Mark, then you heard the baby crying, right?" Answer, "Yes, sir."

A: Yes.

Q: Question: "And you saw Shawn run upstairs, right?"

A: Yes.

Q: Answer: "Yes, sir."

A: No.

Q: So whatever is written here is wrong?

A: Yes.

Defense counsel then questioned Mark about his current testimony that appellant was already upstairs when the baby started crying. Mark previously had testified that appellant did not go upstairs when Kamia started crying until after Mark told Anthony to check on his sister. Again, Mark claimed the court reporter had made a mistake:

Q: And after you saw—after you told Anthony to go upstairs, you saw Shawn run upstairs, didn't you?

A: No. First Shawn went upstairs and then after that she started screaming, and then Sha–Sha went upstairs and then I told Anthony to run upstairs so he could come back and tell me.

Q: Mark, you were asked the following questions the last time you were here, I'm referring to page 49, line 13, question: "Mark, you said that you told Anthony that the baby was crying, right?" Answer: "I told him to go upstairs."

A: Yes.

Q: Question: "After you told him to go upstairs, Shawn ran upstairs, right?" Answer: "Yes."

A: No.

Q: That is not what you said last time?

A: No.

Q: So whoever wrote this down was wrong, right?

A: Yes.

A motion for judgment of acquittal was denied. Defense counsel sought to move into evidence the portions of the transcript of the previous trial with which Mark Williams had been impeached. The government opposed the admission arguing that the jury would put undue weight on these few portions which were just brief excerpts from a lengthy trial.

The trial court ruled that the transcripts of the prior inconsistent statements were not admissible:

I don't think that they're admissible, and particularly when the jury's going to be instructed that they cannot rely upon that impeachment material to prove the truth of the facts contained in it, and by sending in only the impeachment material, I think that you certainly encourage them to go astray on that point. It is not separate substantive evidence. You certainly impeached him at length and you can argue it fully, but I don't think that they're admissible.

Defense counsel was permitted to read the prior inconsistent statements to the jury and

was permitted to argue the inconsistencies as evidence that Mark Williams was not a credible and reliable witness. The prosecutor likewise argued in rebuttal that the inconsistencies in Mark's testimony were nothing more than an eight-year-old getting confused:

> [A]ren't those the kinds of questions and the series of questions that would confuse anyone of us, substituting one, or hearing one name or another? You know? The upstairs, downstairs business.

> Anybody who knows children knows kids have a little bit of problems with before and after, spatial relationships, how you know, the time relationships, that's a hard concept for a child. But when asked the question directly, and point blank, not who's going up and down stairs and so forth, what did Mark tell you?

During deliberations, the jury sent two notes within a short period of time to the trial judge. The first note said, in part:

> We the jury are wondering if we have the right to request that the defendant testify. Some members feel that we have insufficient evidence and/or testimony with which to decide. If this is not possible, why not?

The second jury note read:

> The defense attorney based most of his defense on transcripts from which he read. Were those transcripts then (example, Mark's previous testimony) part of a previous trial, and if so, may we see them?

> [P.S.] If the transcripts were not from a previous trial, where are they from?

After conferring with counsel and addressing the defendant's constitutional right not to testify, the court denied the jury's request for the transcripts but reminded the jurors that they may consider the prior testimony only to evaluate the credibility of the witness. The jury convicted Sean Williams of assault with a deadly weapon and acquitted him of malicious disfigurement while armed.

## III.

In this court, appellant, in reliance upon the Supreme Court decision of *Gordon v. United States,* 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), argues that the trial court committed reversible error when it refused to admit into evidence the prior inconsistent testimony of Mark Williams. The government tells us (somewhat irrelevantly we believe) that in 1995, District of Columbia law "was modified" to permit certain categories of prior inconsistent statements "such as those made under oath" to be admitted as substantive evidence, citing D.C.Code § 14–102 (1995) [a section dealing generally with "Impeachment of one's own witness; surprise"].[5] Therefore, in what presumably is a "catch-one catch all" approach, the government argues, that at the time of appellant's trial, prior inconsistent statements were admissible only to impeach the credibility of the witness, that *Gordon* is distinguishable in that the self-contradiction there was on a matter *material* to the substantive issue at trial, and that in any event, even if the transcripts here should have been admitted into evidence, any error was harmless because the jury was made aware of the existence and content of the prior inconsistent statements (citing *Jefferson v. United States,* 328 A.2d 85 (D.C.1974)). Appellant counters—noting that the government's case here was a circumstantial one, that the inconsistencies bore directly on the critical issue of whether the defendant was in position to commit the alleged crime, that the prosecutor in rebuttal had characterized the inconsistencies as innocent confusion on the part of the witness, and that the jury specifically requested to see these transcripts. On the circumstances here, we are persuaded by appellant's argument.

Any lingering doubt as to whether it was reversible error (or merely harmless error) to withhold the transcript from the jury, is obliterated by the Supreme Court's reasoning in *Gordon, supra.* In that case, Mr. Justice Jackson (speaking for a unanimous court in reversing a conviction) rejected the

---

**5.** While government counsel might have been surprised by the testimony of nine-year-old Mark, counsel understandably did not attempt to claim surprise (for impeachment purposes) of the critical witness.

reasoning of a lower appellate court that an oral admission by a witness on cross-examination (that a written document contradicted his direct testimony) was all that was required, noting:

> We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence, providing it meets all other requirements of admissibility and no valid claim of privilege is raised against it. The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction. We hold that the accused is entitled to the application of that rule, *not merely because it will emphasize the contradiction to the jury, but because it will best inform them as to the document's impeaching weight and significance.*

344 U.S. at 420–21, 73 S.Ct. at 374 (footnotes omitted and emphasis added).

In the instant case, appellant was entitled to have the inconsistent statements introduced into evidence so the jury could decide for itself exactly how much "impeaching weight and significance" to give to those statements. Although the statements were read to the jury during cross-examination and before the defense rested, both defense counsel and prosecution in their closing arguments urged the jury to evaluate the importance (or lack thereof) of the statements. The jury's request to see the transcripts proves that the jurors were attempting to do exactly what was asked of them by both sides, namely examine the "impeaching

weight and significance" of the prior testimony. By not allowing the jurors to review the statements, the trial court impeded their ability to perform the task assigned to them. *See Jefferson, supra,* 328 A.2d at 86 n. 6 ("Prejudice to appellant can occur, therefore, only if the court's error may have impeded the jury's full assessment of [the witness'] credibility.").[6]

The judgment below must be reversed and remanded for a new trial. The error complained of prejudiced substantial rights.[7]

*So ordered.*

---

**6.** Judge Skelly Wright noted a similar rule regarding jury requests:

> It is well established that while a writing used to refresh a witness' memory is not ordinarily admissible, it is properly admitted when offered by the opposing party *or when the jury on its own motion requests to see it.*

*United States v. Smith,* 172 U.S.App.D.C. 297, 309, 521 F.2d 957, 969 (1975) (citations omitted, emphasis added) (holding a police report used to *impeach* a witness should have been admitted where both opposing counsel offered it and the jury requested it).

**7.** In reversing the *Gordon* conviction, the Supreme Court noted:

> Reversals should not be based on trivial, theoretical and harmless rulings. But we cannot say that these errors were unlikely to have influenced the jury's verdict. We believed they prejudiced substantial rights and the judgment must be reversed.

344 U.S. at 423, 73 S.Ct. at 374.