Cristino Gomez DIAZ, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–888.

District of Columbia Court of Appeals.

Argued March 24, 1998.
Decided July 30, 1998.

 

Richard S. Greenlee, Public Defender Service, with whom James Klein and Gretchen Franklin, Public Defender Service, were on the brief, for appellant.

Mary T. O'Connor, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher and Rachel Adelman–Pierson, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge:

Appellant Cristino Gomez Diaz was convicted of second degree child sexual abuse, in violation of D.C.Code § 22–4109 (1996).[1] He filed a timely appeal contending that the trial court committed reversible error by: (1) overruling his objections to certain parts of the government's closing and rebuttal arguments, and refusing to declare a mistrial; and (2) refusing, after the jury had begun its deliberations, to admit into evidence grand jury transcripts containing inconsistent statements made by two government witnesses. We conclude that the prosecutor made improper remarks during her rebuttal, but Diaz was not substantially prejudiced. We also conclude that the trial court did not abuse its discretion in refusing to reopen the case to admit into evidence two grand jury transcripts after the jury had begun its deliberations.

## FACTUAL SUMMARY

On May 29, 1995, eleven year-old M.B. and her ten year-old sister, J.J., were at the home of their aunt, B. Diaz.[2] At the time, Ms. Diaz lived in Northwest Washington, D.C., with her mother, Betty D.J.;[3] her thirteen year-old niece, S.J.; and her husband, appellant Diaz. According to testimony presented by government witnesses, M.B. and her sister watched the television program, "In Living Color" in their cousin S.J.'s room after dinner. Appellant Diaz, who had been drinking beer before and after dinner, was watching a different program in his room, located next to that of S.J. M.B. went to the doorway of Diaz's room to tell him that a funny character called, "The Head" was on, and that he should watch him. Diaz, who was lying on a bed close to the doorway, changed the channel as suggested, and sat on the end of the bed. M.B. leaned against the door of his room. "He grabbed [her] by [her] arms slowly and pulled [her] in slowly and sat [her] down beside him." M.B. did not try to fight or get away because "[she] didn't know at the time what [Diaz] was doing or what he was going to do."

Diaz "felt ... [M.B.'s] chest outside of [her] shirt." M.B. did "[n]othing." She "was scared." Diaz then "put his arm around [M.B. and] put his hand in [her] shirt." He "wrapped his hand around [her] breasts" for about twenty seconds. M.B. was scared that Diaz "might do something to [her] like hit [her] or something" if she screamed or struggled. Diaz then put his hand in M.B.'s panties and "started feeling down below.... He was moving his hand.... [When h]e tried to stick his finger in [M.B.] ... [she] got scared more.... It hurt. [She] just closed her eyes real tight." Diaz then "squeezed her nipple hard." When he tried to kiss M.B. on

---

1. Diaz was sentenced to three to nine years in prison, with execution suspended on all but fourteen months; and three years of probation.

2. M.B. and her sister lived in Maryland with their mother, Arnita B., but were spending the weekend with their aunt and grandmother.

3. Ms. Betty D.J. is the grandmother of M.B. and J.J.

the mouth with his tongue, she moved her head out of the way. Diaz "laid down on the bed and tried to pull [M.B.] down ... with him." M.B.'s "little sister came in the room and [M.B.] told her to wait for [her]." [4] Her sister left, and Diaz asked M.B. if she planned to tell anyone about what happened. M.B. said "no."

When she left Diaz's room, M.B. was "shaking and ... crying ... [b]ecause [she] was scared." [5] She told her sister and cousin what had happened. Her cousin, S.J., suggested that they go and tell their grandmother, Betty D.J. The girls woke Ms. J. up and told her about the incident. After hearing about M.B.'s experience, she instructed M.B. to call her mother, Arnita B. Ms. B. was at home with her mother and boyfriend when M.B. called. The three went to a District of Columbia police precinct to report the incident. Officer Eric Jackson of the Metropolitan Police Department accompanied Ms. B. to Diaz's address. M.B. was "shaking, crying" when Ms. B. saw her. Officer Jackson testified that M.B. "was upset, she had water in the bottom of her eyes. She was sort of shaking."

Diaz testified in his own behalf. He denied touching M.B. in a sexual way. He stated that M.B. came into his room to tell him to watch a television program, and she changed the channel. He told her to leave his room, and when M.B. refused, he grabbed her by the arm and took her out. Diaz asserted that M.B. threatened to do something to hurt him. On cross-examination, Diaz denied drinking on May 29, or having any beers with Thomas J., the son of Betty D.J. He also denied telling Thomas J. that he was drunk on May 29 and may have touched M.B. in the wrong way.

The government called Thomas J. as a rebuttal witness.[6] He indicated that Diaz "told me he was playing with [M.B.] And he stated he might have feeled [sic] her in a way

that she probably thought that he was just feeling her wrong and she just I assume overreacted and just went and told my mom." Thomas J. recalled that he and Diaz had been drinking on May 29, 1995.

Just before Thomas J. was called to testify, the government had given defense counsel a copy of the transcript of his August 3, 1995 grand jury testimony. Defense counsel asked for a recess before cross-examining Thomas J. The trial court granted a fifteen minute recess. Defense counsel impeached Thomas J. with his grand jury testimony. Thomas J. told the grand jury, contrary to his trial testimony, that Diaz said he "didn't do it."

*The Prosecutor's Closing Argument*

During the government's relatively brief closing argument, the prosecutor recounted the story of what had happened to M.B. when she went to Diaz's door to tell him to switch television channels. She portrayed M.B. as an innocent child who knew nothing about sex, and Diaz as one who saw M.B. as "a sex object." Defense counsel objected to at least two of the prosecutor's closing remarks: (1) "[M.B.] is a very lucky girl.... [S]he got away before the defendant did anything further"; (2) "[M.B.] didn't want to tell [what had happened] because it's embarrassing ... ladies and gentlemen [of the jury], ... would any of you want to get up here and sit on this witness stand and tell us about some sexual experience you had?" Defense counsel's objections were overruled.

*Defense Counsel's Closing Argument*

In her closing argument, defense counsel asserted that M.B.'s account of the event "doesn't make sense." She stated: "You know it can't be the truth." She questioned M.B.'s credibility, and maintained that M.B. had a motive to lie because "Mr. Diaz had reprimanded her, pushed her out of his room." She emphasized that M.B. said she

---

4. M.B.'s sister, J.J., testified that when she went into Diaz's room, she saw Diaz trying to pull her sister down on the bed, and M.B. trying to pull up.

5. M.B.'s sister and cousin both testified that M.B. "was shaking" when she returned to S.J.'s room. Her cousin stated that M.B. "was scared ...

[and] was crying real hard.... Her hands and her whole body ... [were] shaking."

6. Thomas J., who was incarcerated at the time of Diaz's trial, responded to questions about his prior criminal record which was quite extensive. He testified that the government made no promises to him in exchange for his testimony.

"couldn't" rather than "wouldn't" take her account of the event back. Defense counsel argued that "[M.B.] couldn't take [her account] back because it had gone too far." She also reminded the jury that M.B. did not "scream" or "yell" or "even say stop," and that M.B.'s mother did not take her to the hospital or the doctor upon learning of the event, even though M.B. stated that Diaz had tried to put his finger into her genital area. She suggested that a government witness, S.J., did not observe the incident, and only said that Diaz had been drinking beer on the evening in question, after "talking with" the prosecutor. She closed on a "reasonable doubt" theme, telling the jurors: "[I]f you were making an important decision in your life, you would not base that decision on any belief in the testimony of [M.B.]."

*The Prosecutor's Rebuttal Argument*

The trial judge later noted that the prosecutor's rebuttal was twice as long as her closing argument. At the outset of her rebuttal, the prosecutor stated: "The defendant's story ... as to why [M.B.] supposedly fabricated this [account] makes no sense whatsoever." She reviewed the story of the encounter between M.B. and Diaz, and cast doubt on Diaz's version of the event. She compared M.B., a "respectful" and "thoughtful" child, to Diaz, implying that he was not respectful or polite. She asked "which one of these people [M.B. or Diaz] is the person that's trying to be honest here ... [and] respectful of the rights of others...." Defense counsel's objection was overruled. The prosecutor continued to recount the incident from the perspective of M.B., describing Diaz's actions, and explaining M.B.'s reactions and demeanor after the incident. When the prosecutor discussed the presence of "little girls" at the Buchanan Street home

on May 29, she mentioned her own "two little girls." The trial judge overruled defense counsel's objection.

In the process of discounting defense counsel's reference to M.B.'s failure to scream when Diaz pulled her into his room, the prosecutor said: "It's not like she's being pulled into a room with a snarling tiger. I mean he was a snarling tiger in fact ... but she didn't know it at the time." The trial court overruled defense counsel's objection, and the prosecutor went on to assert: "[O]f course she didn't scream or yell or fight. There was nothing at that time to be afraid of. Now if that happened to her today, ... it would be a different story." The objection of defense counsel was overruled.

The prosecutor commented on Diaz' use of an interpreter, suggesting that he was using the interpreter to fool the jury into thinking that he did not really understand English:

> But when [Diaz] was testifying, he said well, I didn't really understand what [M.B.] said, but she said I'm going to hurt you. And then the translator, you remember, translated it incorrectly. And remember he corrected the translator. When the translator translated back into English, he said he didn't understand what she was saying to him. But when the translator mistranslated his words, he immediately corrected that translator's English translation of what he had said. So he did understand.[7]

At the beginning of his testimony Diaz was asked whether he understood English. He replied: "Yes." When asked why, then, was an interpreter present, he stated: "Because ... I want to let them know that the man understands me well, that I make myself understood and they understand me."[8]

---

7. During his direct examination at trial, Diaz was asked what M.B. said to him when he took her by the arm and led her out of his room. The translator interpreted Diaz as saying: "I didn't understand it very well since she was talking in English to me, but I sort of understood that she said something that I would hurt her or harm her." According to defense counsel, Diaz corrected the interpreter in Spanish, and the interpreter then said in English: "No. She said to me, she told me that she would harm me or do something that would hurt me."

8. During final instructions, the trial included an instruction on the use of interpreters during trial, and told the jury, in part:

> Now the Spanish/English interpreters you have seen and heard in this courtroom are certified interpreters and have taken an oath to translate these proceedings accurately.... You have ... heard conversations between the interpreter and the defendant that might not have been translated in full.... You are not to speculate as to the content of conversations that may or may not have been translated.

As the rebuttal continued, the prosecutor emphasized that M.B. and her sister were children, and said "I'm an adult." The defense objection was overruled. The prosecutor maintained that J.J. did not perceive anything "wrong necessarily or that it's sex or that the defendant is trying to hurt her sister. Again, this is a person she trusts. So she doesn't have that reaction.... She may regret it now, but she didn't have that reaction then." The trial judge overruled defense counsel's objection.

The prosecutor began to wind up her rebuttal argument by telling the jury Diaz "had a nice little story that was put together." The objection was overruled. After recalling the rebuttal testimony of Thomas J., the prosecutor stated:

> [W]hy shortly after this happened is [Diaz] telling Thomas [J.] a completely different story than he is asking you to believe in this courtroom here today. And we submit that the reason for that is because what he told Thomas [J.] was in his mind, sort of making himself innocent, sounds like well, it was just an accident. I might have touched her in a way she didn't like and I was drinking or whatever. So, no big deal, right? But now he realizes that he has to make up something that sounds a lot better and that's why he comes into this courtroom after all this time and consultation with his attorney and everything—

Defense counsel's objection again was overruled. Government counsel continued: "[T]he story that he told you here today ..., we submit there is absolutely no reason not to believe [M.B.]. There is no way that [M.B.] at age 12 would be able to come in this courtroom and tell you what she told you...." Defense counsel again objected and was overruled. The prosecutor went on to say: "[T]here's absolutely no motive ... for her to come into this courtroom and tell you what she told you except one and that is it's the truth...."

Immediately after the prosecutor completed her rebuttal, the trial court gave final instructions to the jury. After sending the jury to deliberate, the trial judge admonished

the prosecutor for some aspects of her argument concerning: (1) what J.J. did or didn't tell the police and the time a cable movie began when there was no evidence in the record to support the arguments; and (2) her commentary on the sexual awareness of an eleven year-old. At that point, defense counsel only commented on one aspect of the trial court's instructions to the jury. Later, however, while the jury was deliberating, defense counsel requested that court be reconvened. She sought to admit into evidence the transcript of Thomas J.'s grand jury testimony, and moved for a mistrial due to allegedly improper comments by the prosecutor during closing and rebuttal.

In discussing her reasons for requesting a mistrial, defense counsel made six main points: (1) improper comments were made during the rebuttal, leaving defense counsel no opportunity to refute them; (2) the prosecutor improperly told the jury "to do the right thing"; (3) the prosecutor commented on Diaz's consultation with counsel and his credibility, and "linked [defense counsel] in [an] untruth"; (4) government counsel "imputed to the jury that Mr. Diaz was using the interpreter as a ruse"; (5) by telling the jury "we judge people every day," the prosecutor improperly suggested that jurors could base their judgment on "some general subjective basis"; and (6) the prosecutor's rebuttal went beyond the scope of the defense's closing argument.

*The Trial Court's Ruling*

The trial court concluded that: "None of these things [cited by defense counsel to show improper prosecutorial comment during closing and rebuttal] is so egregious that I'm going to abort this thing at a point that it's too late to correct." The judge acknowledged that the prosecutor's comment on Diaz's consultation with counsel "was unsupported" because no evidence had been introduced showing that Diaz spoke to counsel or "got influenced by counsel." However, the court asserted that the comment did not hurt Diaz:[9]

---

9. The trial judge stated that defense counsel did something "infinitely worse" by commenting that

S.J. only testified that "she saw someone drinking beer after talking to [the prosecutor]...."

[O]bviously, there's no mistaking that what [the prosecutor] was saying now and the added statement that if he says this after speaking to counsel ... unless you had horns on you and declared yourself a liar, I don't see where that adds to her argument at all or in any way misleads the jury. So that does not warrant a mistrial.[10]

As for the comment regarding Diaz's use of an interpreter, the trial court found it "of [no] moment." [11]

At the conclusion of the discussion between the court and counsel, the court refused defense counsel's request for an instruction on the interpreter and counsel issues. The reason for the refusal was articulated as follows:

[Y]ou had at least two clean opportunities to request this at a point where they might have been timely. To call the jury out now and make some statement about a Government impropriety, I think would be very unfair and as I said since I don't think either of these things have any real effect, I'm not going to do it.

Moreover, because defense counsel had been given a clean copy of the grand jury transcripts containing the testimony of S.J. and Thomas J., and had not made a timely request that they be admitted into evidence, and because the court saw no prejudice to the defense, the court also refused to admit the transcripts during the jury's deliberations.

## ANALYSIS

### I.

Diaz first contends that the trial court erred in overruling his trial counsel's objections to certain parts of the government's closing and rebuttal arguments which were improper. He argues that "[i]n combination,

the prosecutor's improper remarks amounted to substantial prejudice and deprived [Diaz] of a fair trial." Specifically, Diaz singles out as improper the prosecutor's: (1) comments on his consultation with counsel and the implicit attack on the integrity of his counsel; (2) description of him as "a snarling tiger"; (3) implication that he "was trying to fool the jury about his knowledge of English"; (4) efforts to "[divert] the jury from the evidence by inviting them to sympathize with [M.B.]"; (5) urging "jurors to put themselves in [M.B.'s] shoes"; and (6) "inject[ing] her own personal life into the proceedings." The government maintains that the prosecutor's closing and rebuttal arguments "were supported by ample evidence, did not inflame the passions of the jury, and constituted a fair response to appellant's direct attacks on the credibility of the government's witnesses."

■■■ "In analyzing claims of alleged prosecutorial misconduct, we must first determine whether the prosecutor's actions were improper." *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989) (citing *Jones v. United States*, 512 A.2d 253, 257 (D.C.1986)). We have held a variety of prosecutorial comments during closing and rebuttal arguments to be improper. Although an attorney may comment on or draw logical inferences from the evidence, counsel may not express a personal opinion as to a witness's credibility or veracity. "It is for the jury to decide whether a witness is truthful and an attorney may not inject personal evaluations and opinions as to a witness' veracity." *Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980). Arguing facts not in evidence is improper. *Lee v. United States*, 668 A.2d 822, 830 (D.C.1995). It is improper to ask the jury to draw a negative inference from an accused's decision to consult with counsel. *Henderson v. United States*, 632 A.2d 419, 433 (D.C.1993).

10. With regard to the comment: "do the right thing," the trial court recognized that "it can be improperly used" but that the jury was not misled since, in context, "it was another way of saying the right verdict here on the evidence is guilty." The judge also thought the comment: "We judge people every day" constituted "perfectly proper argument" because the prosecutor "was talking about credibility." The court found "some merit" in the defense assertion that the prosecutor's rebuttal "went beyond" the defense closing argument, but determined that "looking

at it after the fact ..., it certainly doesn't warrant a mistrial."

11. During discussion of the mistrial motion, the trial judge indicated that he did not understand the arguments of counsel pertaining to the interpreter issue, but that even if the jury saw the issue from the defense point of view, the prosecutor's comment was "an interpretation of the evidence that she could give."

Moreover, it is impermissible for a prosecutor to "ma[ke] comments directed to the emotions and prejudices of the jury." *Powell v. United States*, 455 A.2d 405, 410 (D.C. 1982). Significantly, " '[i]mproper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said.' " *Coreas, supra*, 565 A.2d at 605 (quoting *Hall v. United States*, 540 A.2d 442, 448 (D.C.1988)); (citing *Powell, supra* 455 A.2d at 411).

*Improper Prosecutorial Comments*

■ Here, most of the prosecutorial remarks to which defense counsel objected were articulated during the relatively long rebuttal, including the comments regarding Diaz's consultation with counsel, his use of an interpreter, his veracity, and M.B.'s credibility. The prosecutor's rebuttal remarks were improper in several respects. First, the prosecutor strayed from proper comment on, and the drawing of logical inferences from the evidence. Instead, she expressed her personal opinion as to M.B.'s credibility and motivation. She told the jury: "there is absolutely no reason not to believe [M.B.]," and that the only motive that twelve year-old M.B. had for coming into the courtroom was to "tell you . . . the truth."

■ Second, and in contrast to M.B., the prosecutor portrayed Diaz as a person who "has to make up something. . . ." She characterized his defense as "a nice little story that was put together." Further, she commented to the jury that Diaz came to court after the passage of time and "consultation with his attorney . . . [to tell] you . . . the story that he told you here today. . . ." There is no evidence in the record showing that the change in Diaz's story resulted from his visit with counsel, and it is improper for the prosecutor to urge the jury to draw adverse inferences from the defendant's exercise of his right to counsel. *See Henderson, supra*, 632 A.2d at 433.

■ Third, in commenting on Diaz's use of an interpreter, the prosecutor ignored the factual record, implying that Diaz lied when he said he didn't understand what M.B. said to him in English even though he had "corrected [the] translator's English translation of what he had said." This argument completely ignored Diaz's direct examination testimony where he clearly said that he understood English. It also disregarded Diaz's correction of the interpreter on a point important to his defense, and the interpreter's correction of his erroneous interpretation of Diaz's words.[12] Throughout her closing and rebuttal arguments, the prosecutor urged and encouraged sympathy for M.B., telling the jury she was "a very lucky girl . . . [because] she got away before the defendant did anything further"; referencing her own "two little girls"; and acknowledging that M.B. did not "scream or yell or fight" but assuring the jury that "if that happened to [M.B.] today, . . . it would be a different story."

In *Powell, supra*, we stated: "There is no question that the government may prosecute vigorously and zealously. The prosecutor, however, plays a special role in our judicial system and carries unique responsibilities . . . [and] is expected to know and abide by the rules of the court and his profession." 455 A.2d at 408. In this case, the prosecutor exceeded the bounds of the rules and overlooked the court's admonitions not to express personal opinions on the veracity and credibility of witnesses; not to comment on the vital right of the defendant to consultation with counsel; not to make comments appealing to the emotions, prejudices and passions of the jury; to avoid arguing facts not in evidence or misstating facts in evidence; and not to divert the jury's attention from the evidence. *See id.* at 408–10; *Dyson, supra*, 418 A.2d at 130; *Henderson, supra*, 632 A.2d at 433–35; *Lee, supra*, 668 A.2d at 830; *Jenkins v. United States*, 374 A.2d 581, 584 (D.C.1977). We are mindful that improper prosecutorial comments "are looked upon with special disfavor when they appear in the rebuttal because . . . defense counsel has no

12. Diaz testified that M.B. "told me that she would harm me or do something that would hurt me." Originally, the interpreter stated Diaz had said: "I sort of understood that she said something that I would hurt her or harm her."

opportunity to contest or clarify what the prosecutor has said." *Coreas, supra,* 565 A.2d at 605 (citations omitted). Many of the comments about which Diaz complains were made during the government's rebuttal. Even though, in isolation, some of the prosecutor's rebuttal comments may not have been deemed improper, her rebuttal as a whole, including her comment on Diaz's consultation with counsel after saying "he realizes he has to make up something that sounds a lot better . . .," was improper.

*Substantial Prejudice*

Having concluded that prosecutorial closing or rebuttal remarks were improper, we must next determine whether the improper comments "rise to the level of substantial prejudice in order to justify reversal." *Dyson, supra,* 418 A.2d at 132 (internal quotations and citations omitted). "The applicable test to determine whether [improper prosecutorial comments] caused substantial prejudice is whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (internal quotations and citations omitted). "[V]iewing the comments in context, we must consider the gravity of the misconduct, their direct relationship to the issue of guilt, the effect of specific corrective instructions by the trial court, and the strength of the government's case." *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985) (citations omitted).

*Gravity and Corrective Instructions*

We turn first to the factors of "gravity" and "corrective instructions." The prosecutor's improper comments during the rebuttal argument "could reasonably be viewed as very serious," *Lee, supra,* 668 A.2d at 831, and a violation of repeated rulings of this court. However, the gravity of the prosecutor's improper comments is tempered by de-

fense counsel's closing argument. Although defense counsel's persistent comments on the credibility of M.B. generally were grounded in evidence that M.B. had a motive to lie because Diaz had reprimanded her and pushed her out of his room, counsel suggested that at least one government witness changed her account of the alleged sexual encounter after talking with the prosecutor. Moreover, the comment regarding Diaz's consultation with counsel, undoubtedly one of the most serious of the improper remarks, was sandwiched in the prosecutor's reference to Thomas J.'s testimony, and the overall effort to overcome one of defense counsel's themes in her closing argument—that M.B.'s account of the event "doesn't make sense."

We agree with the trial court that the reference to consultation with counsel did not mislead the jury.[13] During the discussion with the trial court of the prosecutor's rebuttal, defense counsel emphasized the perceived attack on the integrity of defense counsel, rather than Diaz's constitutional right of consultation with counsel. In addition, immediately after the trial court concluded its instructions to the jury, defense counsel did not request any corrective instruction related to the prosecutor's improper remarks. Nonetheless, the trial court did instruct the jury regarding the role of the interpreter,[14] and informed the jury that arguments of counsel were not evidence. These instructions ameliorated any harm which might have resulted from the prosecutor's improper comments.

*Centrality and Strength of the Government's Case*

The next two factors to be examined, in an effort to determine whether substantial prejudice resulted from the improper comments, are (1) the "direct relationship [or centrality of the comments] to the issue of guilt," and (2) "the strength of the government's case."

**13.** Diaz asserts that we should apply the standard of review set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), arguing that: "because the comment [about consultation with counsel] urged the jury to use [Diaz's] consultation . . . as evidence of guilt, the conviction must be reversed unless this [c]ourt can say that the comment, and the judge's failure to correct it, was harmless beyond a rea-

sonable doubt." We agree with the government that the *Chapman* standard does not apply because "the prosecutor's comments constituted a proper critique of [Diaz's] credibility and not an attack on his right to counsel."

**14.** *See* footnote 8, *supra.*

*Hammill, supra,* 498 A.2d at 554 (citations omitted). The prosecutor's case turned, in part, on the credibility of M.B. and Thomas J., and to a lesser extent, M.B.'s sister, J.J. The jury reasonably could have perceived M.B. as a credible witness, without the prosecutor's closing or rebuttal arguments, because of her detailed account of the incident; and the description of M.B.'s demeanor by other witnesses after the encounter with Diaz.

M.B.'s sister and cousin testified that when M.B. returned to the room where they were watching television, she "was shaking." Her cousin said M.B. "was scared ... [and] was crying real hard.... Her hands and her whole body ... [were] shaking." When M.B. saw her mother, Arnita B., on the evening of the encounter, she was "shaking, crying." When Officer Jackson saw her, M.B. "was upset, she had water in the bottom of her eyes. She was sort of shaking." Even though Thomas J.'s prior criminal record was brought out on direct examination, and he was impeached with his grand jury testimony, the jury could reasonably have believed his testimony that Diaz had been drinking on the night of the incident, and that Diaz told him that he might have touched M.B. in the wrong way. While the credibility of M.B. and the lack of credibility of Diaz were important to the government's case, there was sufficient other credible evidence from which a jury could reasonably infer beyond a reasonable doubt, without the government's improper remarks, that M.B. was telling the truth when she recounted events proving sexual abuse by Diaz. In short, while Diaz's credibility was important with respect to his guilt, we cannot say with fair assurance, given the other evidence presented by the government, that the judgment was not substantially swayed by the several improper prosecutorial comments, made during lengthy closing and rebuttal arguments. Consequently, we are constrained to conclude that Diaz was not substantially prejudiced by the improper prosecutorial comments.

## II.

Diaz argues that the trial court committed error in refusing to admit into evidence grand jury transcripts containing inconsistent statements made by S.J. and Thomas J. Diaz did not offer the exhibits until after the close of the evidence and submission of the case to the jury. "In general, the decision whether to permit a defendant to reopen [his] or her case after the close of the evidence is committed to the sound discretion of the trial judge, and will not be disturbed in the absence of a clear showing of an abuse." *King v. United States,* 550 A.2d 348, 354 (D.C.1988) (citations omitted). Among the factors which the court should consider in exercising its discretion are (1) the timeliness of the motion, (2) the nature of the evidence, including its relevance, and (3) prejudice to the opposing party. *Id.* (quoting *United States v. Thetford,* 676 F.2d 170, 182 (5th Cir.1982), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983)). "The belated receipt of such [evidence] should not imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." *Id.* (quoting *Thetford, supra,* 676 F.2d at 182). The trial court properly weighed these factors in exercising its discretion to exclude the belatedly proffered evidence, concluding that the request was untimely and would unduly highlight the importance of the evidence, thereby prejudicing the government.

Diaz had an opportunity to place both transcripts into evidence during the trial, but waited until after the jury began its deliberations to request that the documents be admitted. His reliance on *Williams v. United States,* 686 A.2d 552 (D.C.1996), is misplaced. There, we held that "appellant was entitled to have the inconsistent statements introduced into evidence so the jury could decide for itself exactly how much 'impeaching weight and significance' to give to these statements." *Id.* at 556. Our holding was prompted by the fact that during its deliberations, the jury requested the transcripts. Both counsel had "urged the jury to evaluate the importance (or lack thereof) of the statements." *Id.* We said: "By not allowing the jurors to review the statements, the trial court impeded their ability to perform the

task assigned to them." *Id.* (citation omitted). Unlike the situation in this case where Diaz waited until the jury began to deliberate before requesting that the documents be admitted, the evidence in *Williams* was offered before the jury retired to deliberate, and the trial court determined erroneously that such evidence was not admissible. *See id.,* 686 A.2d at 554.

In this case, the jury made no request for the transcripts. Moreover, the inconsistent statements in the grand jury testimony of S.J. and Thomas J. did not have the same role in Diaz's trial as in that of Williams. S.J.'s inconsistent statements concerned whether Diaz had consumed alcohol prior to the incident, and Thomas J.'s transcript contained statements favorable and unfavorable to Diaz. Admitting the transcripts while the jury deliberations were in progress would have given them undue and exaggerated importance. We see no error in the trial court's refusal to allow late introduction of the transcripts into evidence.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*

SCHWELB, Associate Judge, concurring in the judgment:

In my opinion, most of the remarks by the prosecutor of which Diaz complains, if improper at all, were only marginally so. The few speculative words that the prosecutor spoke about the defendant's having changed his story after consulting his attorney might providently have been left unsaid, but I do not believe that they represented an attempt by the prosecutor to burden the defendant's exercise of his constitutional right to counsel. Rather, the prosecutor was attempting to show why Diaz may have changed an earlier account which he originally believed to be exculpatory but which was in fact incriminating.

By and large, in my view, the prosecutor's arguments on the credibility of the complaining witness and of the defendant were grounded in the record or in reasonable inferences therefrom. They were not "outright" expressions of personal opinion of the

kind which our cases have condemned. *See, e.g., Irick v. United States,* 565 A.2d 26, 36 (D.C.1989) (citations omitted). The prosecutor's statement that she has two daughters was inappropriate but, in my opinion, inconsequential.

The trial judge was in the courtroom as the relevant events unfolded, and his vantage point and "feel" for the case were necessarily superior to ours. Under the circumstances, I cannot say that the judge abused his discretion in overruling most of the defense objections. As we noted in *Irick, supra,* 565 A.2d at 33, "it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." For my own part, I discern no such error or abuse of discretion, and I agree with Judge Reid that the judgment should be affirmed.