**Luther FULLER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 98–CF–1655.

District of Columbia Court of Appeals.

Argued March 28, 2002.

Decided May 12, 2005.

Ross E. Davies, with whom John Moustakas and Jeffrey M. Klein, Washington, DC, were on the brief, for appellant.

Janet E. Albert, Assistant United States Attorney at the time the brief was filed, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Paul A. Quander, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and STEADMAN, Senior Judge.*

RUIZ, Associate Judge:

On June 16, 1997, appellant, Luther "Reds" Fuller, was indicted for first-degree murder while armed and two related weapons charges in connection with the December 28, 1996 shooting of Danny Murray. In his first trial, appellant was acquitted of first-degree murder and the jury deadlocked on the lesser-included offenses (second-degree murder and voluntary manslaughter while armed) and the two weapons charges. A mistrial was declared, and appellant was subsequently retried for second-degree murder while armed and the two weapons offenses. Ap-

* Judge Steadman was an Associate Judge of the Court at the time of oral argument. His status changed to Senior Judge on October 18, 2004.

pellant was convicted of all three charges, and now appeals these convictions, arguing that the trial court erred by failing to allow defense counsel to effectively cross-examine a key government witness, and submitting to the jury during its deliberations a transcript of the appellant's testimony from the first trial which had been read into evidence in the second trial. We find no abuse of discretion in the limits the trial court placed upon the cross-examination. Although we agree with appellant that the trial court should not have submitted the transcript to the jury without first deciding whether there was particular need to do so and without giving a curative instruction, the error was harmless, and we affirm.

## I.

### A. The Government's Case

On December 28, 1996, at approximately 1:30 p.m., Danny Murray was shot and killed in the vicinity of 601 Virginia Avenue, S.E. Just prior to the shooting, Murray, Willie McPherson, and another person were working on Murray's car in a parking lot at that address. Appellant and his friend Carl "Squirt" Jones approached Murray, and appellant and Murray began to wrestle while Jones sat on a fence nearby. Two eyewitnesses provided different accounts of what happened next. Maurice Murray, Danny Murray's uncle, testified that after a brief scuffle, appellant walked around the corner of a building and re-

turned with a silver handgun, shooting his nephew two to four times before fleeing in the direction from which he had appeared.[1] The second witness, McPherson (who was working on the decedent's car), testified that when the fight broke up, appellant walked over to his coat, pulled a pistol from it, and shot Danny Murray. Murray fell to the ground, and appellant walked closer towards him firing "a couple more times" before fleeing the scene.[2] McPherson also claimed that Murray got up and ran after being shot, stopping only when McPherson told him to lie down. Despite the differences in their versions of events, both men were unequivocal in their identification of appellant as the shooter. Maurice Murray told the police that "Reds" (appellant's nickname), who was the son of a neighborhood barber, had killed his nephew,[3] and McPherson indicated he had no doubt that "Reds" was the shooter.

After the shooting, appellant and Jones fled towards 501 Virginia Avenue, S.E., and Metropolitan Police Department officers arriving on the scene observed them running out of the building at that address a few minutes later. The officers gave chase in a vehicle, pulling up to the two youths, exiting their car, and ordering them to stop. While Jones complied, appellant continued to run until he was eventually caught a short distance away, wearing a bulletproof vest. The murder weapon was not found. Both appellant and Jones were taken back to the crime scene, where Maurice Murray again iden-

---

1. Maurice Murray testified on direct examination that he was standing in an alley by the lot where his nephew was working on his car and had bought a bottle of vodka from which he had taken "one sip." Although he admitted on cross-examination that he had taken two sips before the shooting, a police officer who later interviewed him testified that he did not appear to be intoxicated.

2. McPherson was impeached with three prior felony convictions and the fact that he did not come forward with his story until subpoenaed by the government.

3. After telling police that appellant shot his nephew, Maurice Murray gave a description of the clothing worn by the shooter that did not match what appellant was wearing when apprehended by the police, but which, instead, described Jones' attire.

tified appellant as the shooter without any hesitation.

Other government witnesses corroborated that appellant had killed Murray. Danyell Hunter testified that some time after Christmas in 1996, appellant and Murray had been fighting on the third floor of Murray's apartment building at 601 Virginia Avenue. When the fight was broken up, appellant said he wanted to "finish [it] outside." Hunter saw appellant pull out a silver gun from his right front coat pocket so that Murray could see it. Appellant left, but returned a short time later, calling for Murray to come outside and "finish" the fight. Murray's next door neighbor, Samantha Jefferson, testified that the day before Murray was killed, appellant warned her to stay away from the third floor of Murray's apartment building because he was seeking revenge. LaShauntya Moore, a friend of appellant, testified that he had called her from jail in January of 1997 and confessed that he had shot Murray, but in self-defense. Finally, MPD Officer Michael Jewell testified that he saw appellant at the homicide branch forty-five minutes after his arrest, and that appellant asked him how much time he would get if he were convicted and said that he "shouldn't have gotten up that morning."

Appellant's testimony from the first trial was admitted into evidence and read into the record by the government. During closing argument, the government characterized appellant's explanation of the events—in which he admitted to being on the scene, but said that Jones was the shooter—as an attempt to shift his blame to Jones. At the government's request, and over defense objection, a transcript of appellant's testimony from the first trial was provided to the jury before deliberations.

### B. The Defense Case

The defense theory of the case was that appellant had been misidentified as the shooter and that it was Jones, not appellant, who had killed Murray. Three MPD officers were recalled to testify concerning the clothing appellant and Jones were wearing on the day of the murder in an attempt to show that Jones had been wearing clothes which matched the description that Maurice Murray had informed the police the shooter was wearing. Appellant's best friend, James Moore, testified that he was present during appellant's conversation with Jefferson and that appellant had not warned her about his seeking revenge against Murray. Although he had testified at his first trial, appellant did not take the stand at the second trial.

## II.

Appellant argues that he was not given the opportunity to effectively cross-examine a key government witness, LaShauntya Moore, who testified that, during a phone call she had with appellant while he was in jail pending the first trial, appellant confessed to shooting decedent, claiming he did it in self-defense. He contends that the trial court improperly prevented defense counsel from impeaching Moore by exploring whether she had reasons for fabricating her trial testimony about the phone conversation she said she had with appellant and inquiring about certain inconsistencies between her grand jury and trial testimony. He also claims that the trial court improperly denied *in limine* the defense's proffer of the testimony of Keith Tate, who would have testified that he, not appellant, was the source of Moore's trial testimony, further impeaching her and explaining to the jury that her testimony about appellant's confession was unfounded. As we now discuss, we conclude that these claimed errors—whether viewed in

isolation or considered together—do not warrant reversal.

## A. Veracity of Moore's Trial Testimony

■ Appellant's theory in cross-examining Moore was that she fabricated that she had a telephone conversation with appellant during which he confessed to killing Murray in self-defense in order "to cover up the fact that she was spreading a lie that Fuller had killed decedent in self-defense throughout the neighborhood." At trial, defense counsel began by cross-examining Moore regarding the tendency of the neighborhood residents to gossip, and that when Moore returned home to the neighborhood from North Carolina, she found the residents were talking about appellant's arrest for the shooting. When defense counsel began to imply in cross-examination that Moore had fabricated the testimony in order to "show off" her inside knowledge to her neighbors, the government objected. After a bench conference, the trial court, which did not see the relevance of this line of questioning, sustained the objection.[4]

■ On appellate review, "[a]n exercise of judicial discretion 'will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable.'" Clayborne v. United States, 751 A.2d 956, 963 (D.C.2000) (quoting Johnson v. United States, 398 A.2d 354, 363 (D.C. 1979)). Although "[b]ias or testimonial motivation is always a proper subject of cross-examination," Clayborne, at 962, we have required that the examiner have a reasonable factual foundation or at least a "well-reasoned suspicion" that the circumstances indicating bias might be true.[5] See id. at 962–63. While this "good faith basis" requirement, which defense counsel twice referred to in her proffer, is both flexible and lenient, id. at 963, the examiner must proffer a proper foundation consisting of "some facts which support a genuine belief that the witness is biased in the manner asserted. . . . In addition, the attorney must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias." Guzman v. United States, 769 A.2d 785, 790 (D.C.2001) (ellipsis in original) (quoting Brown v. United States, 683 A.2d 118, 124–25 (D.C.1996)).

■ Here, although defense counsel asserted that she had a "good faith basis" to believe Moore's trial testimony was fabricated, counsel proffered no facts in support of her assertion that Moore had fabricated her trial testimony that appellant had confessed to her during a telephone conversation from jail for the purpose of covering up an earlier lie she had told others in order to participate in the neighborhood gossip. The trial court did not err in limiting the cross-examination of

---

4. Defense counsel proffered the following in an attempt to demonstrate the relevance of the questioning:

Having no personal knowledge of what happened and she, I have a good faith basis for believing this, began to tell people that it was self-defense. And she had no basis for it, but that's what she started to say. That's the story she told. Her testimony in the Grand Jury was that [appellant] told her that was self-defense. I, obviously, don't know why this witness is making it up. I have a good faith basis to believe that she's

making it up. And I do know that she began—she came home from North Carolina and thinking this was a hot topic and she began telling people that it was in self-defense.

5. " 'Bias' refers both to a witness' 'personal bias for or against a party' and to his or her 'motive to lie.' " Brown v. United States, 683 A.2d 118, 124 n. 7 (D.C.1996) (quoting Ford v. United States, 549 A.2d 1124, 1125 n. 2 (D.C. 1988)).

Moore, because "[w]here a proper foundation has not been laid for bias cross-examination, the trial court may exercise its discretion to preclude the inquiry." *Id.* at 790. *See Joyner v. United States,* 818 A.2d 166, 171–72 (D.C.2003).

### B. Exclusion of Testimony of Keith Tate

■ A related argument is that the trial court erred when it excluded the testimony of Keith Tate, appellant's brother. Defense counsel proffered Tate would testify that, although he had no personal knowledge of the shooting, he had told Moore that if appellant had committed the shooting, it must have been in self-defense. Appellant's theory was that Tate's testimony would have shown that the idea that appellant committed the shooting in self-defense may have been planted in Moore's mind by Tate, and did not originate in appellant's purported confession during a telephone conversation.[6]

Defense counsel's proffer as to the relevance of Tate's testimony to Moore's credibility suffers from the same infirmity as the proposed questioning of Moore's gossip-mongering: counsel proffered no facts to support the theory that Tate had planted the idea in Moore's mind. Although Tate could testify as to what he had told Moore, he had no way of knowing what the source of Moore's testimony was, and it was pure speculation to imply that it was his statement to her—even if the jury believed he made it—that caused her to testify at trial that appellant had confessed to shooting Murray in self-defense during a telephone call from jail. The attorney "must proffer facts sufficient to permit the trial judge to evaluate whether the proposed question is probative of bias." *Guz-*

*man,* 769 A.2d at 790 (citing *Brown,* 683 A.2d at 124–25). The trial court in this case was not provided with any facts to support that Tate's testimony would serve to show that Moore had fabricated appellant's confession. Thus, the trial court did not abuse its discretion in excluding Tate's testimony.

### C. Moore's Inconsistent Grand Jury Testimony

■ Appellant's final argument stemming from the cross-examination of Moore is that the trial court erred in cutting short defense counsel's questioning regarding inconsistencies between Moore's trial and grand jury testimony. In her grand jury testimony, Moore had claimed that she was present at a fight between appellant and Murray, but at trial, she testified that she had not been at the fight. After defense counsel impeached Moore with her grand jury testimony, Moore explained that there were two fights, only one of which she had witnessed. All the other witnesses who testified about the fight had said that there was only one fight between appellant and decedent. Appellant asserts counsel should have been permitted to further cross-examine Moore as to the number of fights.

■ Whether there had been one or two fights did not go directly to the issue of appellant's guilt, but was a means of impeaching Moore's trial testimony that appellant had confessed to the shooting. Defense counsel was allowed to point out Moore's inconsistent grand jury testimony concerning the number of fights, and every other witness had testified, contrary to Moore, that there was only one fight be-

---

**6.** This theory, we note, is in tension with defense counsel's "good faith basis" to believe that the reason Moore had fabricated her trial testimony was to cover up that she had spread a lie about appellant's confession to show off in the neighborhood.

tween appellant and Murray.[7] Although appellant claims that the line of questioning about the number of fights was necessary to undermine Moore's credibility as a witness,[8] she had already been thoroughly impeached on this point. Therefore, because "[t]rial judges retain a wide latitude ... to impose reasonable limits on such cross-examination based on concerns about ... confusion of the issues or interrogation that is repetitive or only marginally relevant," *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the trial court did not abuse its discretion in limiting defense counsel's questioning of Moore regarding the number of fights between appellant and decedent.

## III.

Although appellant does not challenge the admission of the testimony he gave during his first trial,[9] he argues that the trial court committed reversible error when, over defense objection, it submitted the 160 page transcript of the testimony to the jury in the second trial for use in its deliberations. He maintains that, under the common law, a trial court had no discretion to send depositions and other testimonial materials to the jury room for un-

supervised review by the jury. *See, e.g., People v. Montoya*, 773 P.2d 623, 625–26 (Colo.Ct.App.1989). If testimonial materials are submitted to the jury during deliberations, he argues, the court must give precautionary instructions that guard against " 'two inherent dangers' in sending transcripts to the jury—[that] the jury 'may accord undue emphasis' to the testimony ... [and that it] may apprehend the testimony 'out of context.' " *United States v. Wilson* 333 U.S.App. D.C. 103, 119, 160 F.3d 732, 748 (1998) (quoting *United States v. Rodgers*, 109 F.3d 1138, 1142 (6th Cir.1997)).

In the cases cited by appellant in support of his argument, the jury had requested transcripts of testimony it had heard during the trial to assist it in deliberations. *See, e.g., United States v. Hernandez*, 27 F.3d 1403, 1408 (9th Cir.1994) (abuse of discretion where trial court furnished jury, upon jury's request, with transcripts of particular testimony heard during trial with no cautionary instructions against overemphasis by jury). Thus, the government contends, an important distinction between the cases cited by appellant and the present case is that here appellant did not testify at the second trial, and the jury did not ask for his testimony; rather the

7. As the court stated in sustaining the government's objection to the continuation of this line of questioning:

> She says that there was another fight. She says it happened more than once. I don't see how you can bring out any more contradiction to this when the whole issue was there were other fights. I don't want to get into that. I think that's collateral and we're going to stop at this point.

8. In response to the court's curtailment of her cross-examination, defense counsel objected:

> Whether or not the jury decides that there was one or several fights is a credibility determination. To the extent the jury does find that there was one fight, ... I think that there should be some further examina-

tion to point out the inconsistencies between the examinations of other witnesses about what happened during that point and what this witness has said, but I'll defer to the Court.

9. At trial, defense counsel objected to the government's reading of the transcript, suggesting instead that a recording of the appellant's testimony should be played for the jury so it could better assess appellant's meaning and credibility. The trial court ruled that the prior testimony could be read to the jury. The manner in which the testimony was presented during trial is not challenged on appeal; the only argument on appeal is that the transcript should not have been submitted to the jury during deliberations.

transcript of appellant's testimony from the first trial had been admitted into evidence, and therefore could be provided to the jury "like any other admitted exhibit." Although it does not cite cases in which a transcript of the non-testifying defendant's testimony at a prior trial was submitted to the jury, the government relies on the general proposition that the decision to submit exhibits to the jury during deliberations is well within the discretion of the trial court. *See Buckner v. United States,* 81 U.S.App. D.C. 38, 39, 154 F.2d 317, 318 (1946) (holding that the trial court properly exercised its discretion in permitting the jury to take document signed by defendant into the jury room); *Robinson v. United States,* 93 U.S.App. D.C. 347, 350, 210 F.2d 29, 32 (1954) ("Appellant complains that ... exhibits [transcripts of extrajudicial statements of witnesses] were sent to the jury room. This is a matter for the trial court's discretion.... We think it immaterial that the court acted sua sponte"). Therefore, argues the government, the trial court acted within its discretion in providing the jury with the exhibits that had been admitted in this case, including the transcript of appellant's previous testimony.[10]

Appellant's claim raises serious concerns grounded on the value placed on ensuring that the jury fairly evaluate all the evidence without being unduly influenced to give more emphasis to some of the evidence. Although courts are not uniform, most consider that it is within the discretion of the judge to allow "many types of tangible exhibits [and] written exhibits generally *except for those that are testimonial in nature* .... The reason underlying this latter exception is that writings which are merely testimony in a different form should not, by being allowed to the jury, be unduly emphasized over the other purely oral testimony in the case."[11] 2 McCormick on Evidence § 217 at 30 (John William Strong, ed., 5th ed. 1999) (emphasis added). A clear distinction is drawn between admitting previous testimony (from a transcript) as evidence, and providing the transcript to the jury:

> [W]ritten testimony is not to be read by the jury in the jury room but is to be read to them in open court, subject to all objections to be made, the same as if the witness were present and testifying. The written record thereof should not be taken to the jury room where the jury might read it. A written instrument, made an exhibit in the cause but not consisting of testimony of a witness in the case, may of course be taken to the jury room the same as maps, diagrams, and other exhibits. But the testimony of a witness is in a different category .... If ... the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memo-

---

**10.** The trial court made it clear that both parties were free to submit any admitted evidence to the jury room:

> Any prior transcript, whether it be your impeachment that you have made here, statements that are prior statements, I believe that the parties are entitled to put those written documents in if [they] are admissible.

The government contends that the impact of the transcript of the appellant's testimony on the jury was diluted because the jury also received, at appellant's request, portions of the transcript containing the prior testimonies of Moore and Hunter, and a statement made by Jefferson to a defense investigator. Appellant has questioned whether the record supports that the jury received all these transcripts. In any event, we think that even if other transcripts were provided to the jury, a defendant's testimony is likely to attract jurors' attention.

**11.** There is "an exception to the exception" for written or recorded confessions in criminal cases. McCormick § 217, at 30.

ry of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony?

*State v. Solomon*, 96 Utah 500, 87 P.2d 807, 811 (1939). *See Tibbs v. Tibbs*, 257 Ga. 370, 359 S.E.2d 674, 675 (1987) (citing *Thomason v. Genuine Parts Co.*, 156 Ga. App. 599, 275 S.E.2d 159, 162 (1980)) ("It is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once."); *State v. Freetime*, 303 So.2d 487, 488–89 (La.1974); ("The general reason for the prohibition [on submission of testimonial evidence to the jury] is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them."); *State v. Brooks*, 675 S.W.2d 53, 57 (Mo.Ct.App.1984) ("Generally, exhibits ... which are testimonial in nature may not be given to the jury during their deliberations."); *Commonwealth v. Ravenell*, 448 Pa. 162, 292 A.2d 365, 370 (1972) (citing Pennsylvania Rule of Criminal Procedure 1114, which provides that "[up]on retiring for deliberations, the jury may take with it such exhibits as the trial judge deems proper. The jury shall not be permitted to have a transcript of any trial testimony."); *State v. Monroe*, 107 Wash.App. 637, 27 P.3d 1249, 1254 (2001) (permitting jury to have transcript of testimony of one witness but not another "allowed the jury to place undue emphasis on the testimony of one witness and that emphasis affected the verdict"). Some courts, on the other hand, appear not to draw a distinction between transcripts and other evidence admitted at trial. *See State v. Ahmadjian*, 438 A.2d 1070, 1082 (R.I.1981) ("It is well settled that it is within the sound discretion of the trial justice to allow transcripts to be used by the jury during their deliberations once they have been properly admitted as a full exhibit."); *People v. Fujita*, 43 Cal.App.3d 454, 473, 117 Cal.Rptr. 757 (1974) (citing California Penal Code § 1137 and stating that "the jurors, upon retiring for deliberation, may take with them all papers which have been received into evidence (except depositions)").

The risk that the jury might give undue weight to some testimony because it is available in transcript form over jurors' recollection of other, untranscribed trial testimony is heightened where the transcript is of the testimony of the defendant, because a defendant's admissions normally carry particular force with a jury. Moreover, there is a Fifth Amendment concern, for even if a defendant's testimony from a prior trial has been properly admitted as evidence, a transcript of that testimony might receive greater scrutiny—and invite impermissible inferences—where the defendant has exercised his constitutional right not to take the stand at a second trial. We have previously cautioned against the unfettered use of transcripts that have been used in the courtroom as an aid for the jury while listening to tapes of recorded convictions. In *Springer v. United States*, 388 A.2d 846, 853 (D.C.1978), we set forth guidelines, "to assist the trial court in the future when confronted with questions of admissibility of ... transcripts." *Id.* Thus, trial judges have been advised to verify the accuracy of the transcript, restrict the jury's access to the transcript to their contemporaneous use while listening to the tapes, and give a cautionary instruction against relying on the transcript over the jurors' recollection of the recording. *See id.* at 854. Otherwise, "[t]he transcripts should not be permitted in the jury delib-

eration room without the express consent of all parties concerned." *Id.* Even though in this case, unlike in *Springer,* the transcript had been admitted into evidence, we do not think that the admissibility of the transcript as evidence translates to its ready submission to the jury. Therefore, although no blanket rule prohibits submitting to the jury for its deliberation the transcript of a defendant's testimony that has been admitted as evidence, the attendant risks require that it not be done reflexively and as a matter of course. A trial judge should first consider whether the jurors have a particular need for the transcript, and if so, give a special instruction cautioning against unduly emphasizing the transcript over other evidence.[12] *See United States v. Carson,* 464 F.2d 424, 436 (2d Cir.1972); *United States v. McMillan,* 508 F.2d 101, 106 (8th Cir.1974). In a case where the transcript is of the defendant's testimony, the judge should further caution the jury, if requested by the defense, against making impermissible inferences contrasting the defendant's decision to testify at an earlier trial and his choice not to testify at the second trial. The trial court did not take these measures—nor was he asked to do so—before submitting the transcript for use by the jurors during their deliberations in this case.

■ Even if it was error to submit the transcript, however, there was no prejudice warranting reversal. Appellant claims that the prosecutor's frequent references to his testimony at closing demonstrate that it was used against him and further directed the jury to focus on the transcript. Appellant's testimony from the first trial that was read and given to the jury in transcript form, however, was not inculpatory, but consistent with his defense in the second trial that he had been misidentified and that Jones, the person who was with him at the time of the shooting, had shot Murray. Other than the general argument that the jury is prone to overemphasize transcribed testimony, appellant has not referred us to any portion of the transcript that—if given particularized scrutiny by the jury—would have seriously prejudiced his defense. The jury's reading of the transcript would, if anything, have presented appellant's case again while the jurors deliberated, as defense counsel urged them to do during closing argument.[13] Although the trial judge did not specifically instruct the jury with respect to the transcript of appellant's prior testimony, he did instruct the jurors that they must not draw any inference of guilt from appellant's decision not to testify at the second trial. Finally, we consider the strength of the government's case. While there were some inconsistencies in their accounts, two eyewitnesses who knew appellant from the neighborhood positively identified him as the shooter. Several other witnesses provided a motive for the shooting and another said appellant had confessed to having shot Murray, albeit in self-defense. Considering the matter in the context of the entire trial, we are confident that the jury's access to a transcript of the non-testifying appellant's testimony from a previous trial did not sway the verdict, and that any error in providing the transcript was therefore harmless. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**12.** We assume that the trial judge would have made a finding about the accuracy of the transcript preliminary to admitting the prior testimony into evidence.

**13.** We take appellant's point that, once the trial judge had decided to give the transcript to the jury, defense counsel had no option but to make the best of the unwanted ruling.

*Affirmed.*[14]

14. Appellant's reply brief informs the court that, while the appeal was pending, defense trial counsel joined the same firm as appellate counsel and that, as a result, appellate counsel was unable to investigate and pursue possible claims of ineffective assistance of trial counsel. In view of the inherent conflict, we grant appellate counsel's request that the direct appeal be considered and decided without application of the procedural bar imposed by *Shepard v. United States*, 533 A.2d 1278, 1280 (D.C.1987), to any subsequent challenge to trial counsel's performance.