**Jermaine S. SPENCER, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 05–CF–1350.

District of Columbia Court of Appeals.

Argued Jan. 22, 2008.

Decided April 8, 2010.

**6.** DOES's motion for summary affirmance is accordingly denied.

Peter H. Meyers, Washington, DC, for appellant.

Kristina Ament, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Elizabeth Trosman, John Han, and Elizabeth Gabriel, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

RUIZ, Associate Judge:

Appellant, Jermaine S. Spencer, was convicted of assault with a dangerous weapon ("ADW"),[1] possession of a firearm during a crime of violence ("PFCV"),[2] and carrying a pistol without a license ("CPWL"),[3] all in connection with the

---

1. D.C.Code § 22–402 (2001).

2. D.C.Code § 22–4504(b) (2001).

3. D.C.Code § 22–4504(a) (2001).

shooting death of Anthony Gabriel.[4] On appeal, he argues that the trial court erred by (1) failing to properly instruct the jury that it must find that appellant had the same intent required of the principal actor in order to be convicted on an aiding and abetting theory; (2) not allowing defense counsel to respond to the aiding and abetting argument that, he claims, the prosecutor made for the first time in its rebuttal; and (3) refusing the jury's request to see the impeaching grand jury testimony of a key witness. We conclude that the aiding and abetting instruction given was erroneous, but did not constitute plain error; that exclusion of the grand jury testimony also was error, but harmless; and that the trial court did not abuse its discretion in denying appellant's request for additional argument. Accordingly, we affirm.

## I. Facts

### A. The Government's Evidence

Appellant's convictions arise from the fatal shooting of Anthony Gabriel on October 5, 2003. That day, at approximately 1:00 a.m., Kionna Mitchell was in the area of 13th Street and Savannah Place in Southeast, Washington, D.C. Nearby, Mitchell saw Gabriel, Jowuan Lewis ("Juan" or "Fats") and a woman named Tyianne Thomas ("TT") who were "arguing amongst each other ... real loud." Apparently, Gabriel had discovered that some marijuana he had earlier was missing, and accused Lewis and Thomas of taking it and demanded that they give it back. "[Thomas] separated herself from the situation," and Lewis told Gabriel that he did not take the missing marijuana. Gabriel then took Lewis's coat and told

Lewis that he was not going to give him his coat back until Lewis returned Gabriel's "weed."

At that point, Lewis walked away and made a phone call. Mitchell heard Lewis say over the phone, "[H]ey, I need you to come right here because I got a beef on 13th." A couple of minutes later, Mitchell saw a man who came walking around the corner and approached Gabriel and Lewis, but she could not see the man's face. The man pointed a handgun at Gabriel and demanded that Gabriel return Lewis's coat. Gabriel dropped the coat, and the man shot him two to three times. According to Mitchell, neither Gabriel nor Lewis had a weapon, and Gabriel had not made any aggressive movements toward the man before he started shooting. Immediately after the shooting, Lewis and the man who fired the gun ran away.[5]

Mitchell testified that she was "positive" that Lewis was not the shooter because the man "who shot Tony [Gabriel] is smaller than Juan [Lewis]." Lewis was much heavier (approximately five feet, two inches tall and about 240 pounds), whereas appellant was slimmer (five feet, seven inches tall and about 150 pounds). She could not, however, identify appellant as the man who shot Gabriel.

Later in the day of the shooting, police officers attempted to stop and speak to appellant upon receiving information that he had been involved in the shooting. Detective Stanley Farmer, along with other plainclothes detectives, went in unmarked police cars to meet appellant as he was dropping his children off at their mother's house. As appellant drove into the park-

---

**4.** This was a retrial. In the first trial, appellant was acquitted of first-degree murder, but the jury was unable to reach a verdict on the other counts. In the second trial, appellant was acquitted of second-degree murder, but convicted of ADW and the weapons offenses.

**5.** Three .380–caliber cartridge casings and a coat were later found at the scene of the shooting.

ing lot with his children and girlfriend, Detective Farmer pulled his car in front of appellant's car, and other police officers (also not in uniform) started to walk toward appellant. Appellant put his car in reverse and backed out of the parking lot onto the street. He then drove away "at a high rate of speed." Several cars pursued appellant, including a marked police vehicle which was directly behind appellant's car with its flashing lights and siren activated. Appellant continued to speed into Maryland with his children and girlfriend still in the car. Appellant eventually stopped in a residential parking lot, where he jumped out of the car and started running. Detective Farmer stopped his car and gave chase. The detective temporarily lost sight of appellant, but soon saw and apprehended him.

Detective Farmer and Detective Michael Fulton interviewed appellant at the Prince George's County police station. At that time, appellant denied having any knowledge of the shooting. That evening, however, after a second interrogation in which appellant was told that Detective Farmer had spoken to "Fats" (Lewis), appellant admitted that he had shot Gabriel. Appellant said that he had been at home with his girlfriend when he received a call from Lewis, who told him that "he was having some problem with somebody" who had taken his coat. Appellant went to help Lewis and brought a gun with him. When he arrived on the scene, appellant saw that Gabriel "was out there trying to run his mouth." Appellant told Gabriel to give Lewis his coat back. In response, Gabriel threw the coat to Lewis, and then made "some sort of movement" toward appellant. Appellant said that he shot Gabriel because "he feared for his life." In short, appellant confessed to shooting Gabriel, but claimed that he had acted in self-defense.

A search warrant was executed at the apartment appellant shared with his girlfriend. The police recovered a black "M & M" jacket and a pair of dark blue jeans. Lewis testified that appellant wore "dark-colored jeans and a black M & M racing shirt" that night.

### B. The Defense Evidence

Appellant testified that he received three calls from Lewis on October 5, 2003, during which Lewis told appellant to come outside and bring him a bag that Lewis had asked appellant to hold for him two or three days earlier. When appellant first received the bag, he did not know what was inside it. However, once appellant had taken the small black bag home he unzipped it and saw that it contained "a whole bunch of little baggies of marijuana [ ] stacked up inside." Appellant denied ever knowing there was a gun in the bag.

Appellant testified that in response to Lewis's calls, he took the bag and met Lewis in the area of Savannah Place and 13th Street.[6] When appellant arrived, Lewis took the black bag from him, opened it, and "pull[ed] out a little silver gun." At that point, Gabriel began to walk away and Lewis said, "[N]o, you're going to give me my coat." When Gabriel looked back at Lewis, Lewis shot him three times.

Appellant testified that his confession to the police was a lie, and that he neither shot Gabriel nor assisted Lewis in shooting him. According to appellant, he confessed to shooting Gabriel because Lewis had threatened that if he did not take the blame, Lewis would go after his girlfriend. Appellant testified that the detectives told

---

6. In her testimony, Mitchell said she did not hear Lewis ask appellant to bring a bag, nor did she see the man with the gun who joined Lewis and shot Gabriel with a black bag.

him that they had spoken to Lewis, who told them that appellant was the shooter. Appellant was scared that if he did not confess, the police would go after Lewis, and Lewis would learn that appellant had "pointed the finger back at him." Appellant feared that Lewis would then carry out the threat to kill appellant's girlfriend.

In addition to being impeached by appellant's confession to police that he had shot Gabriel in self-defense, appellant's trial testimony denying that he shot Gabriel was impeached with a statement he made to the police officers in which he spontaneously stated that "he felt stupid for answering the phone from [Lewis] that night and shooting someone." Appellant was also impeached with prior convictions for CPWL, possession of an unregistered firearm, and unlawful possession of ammunition.

The defense called Lewis as a witness. Lewis testified that when Gabriel realized that his marijuana was missing, he became "hysterical," and that he walked away in an attempt to avoid Gabriel because Lewis did not have the marijuana and "wasn't trying to fight." Gabriel followed Lewis, however, and threatened to "beat the shit out of [him]" and "grabbed" his coat. Lewis then called appellant and told him to "come [to] 13th street, it's important," but did not explain why he wanted appellant to come. Lewis called appellant again and told him to "hurry." Lewis acknowledged that he was "angry" at Gabriel, and Mitchell also testified that Lewis was angry after Gabriel took his coat.

When appellant arrived, Lewis told him that Gabriel had taken his coat. Appellant and Lewis approached Gabriel to try to get the coat back, and the three men began to argue. Lewis saw appellant reach into his pants for a gun, and Lewis tried to get the gun from appellant, saying "[G]ive me the gun, I'll shoot him instead of you

shooting him." Lewis testified that he had no intention of shooting Gabriel, however, but only wanted to scare him into returning the coat. Appellant did not give Lewis the gun. Instead, he placed it back in his waistband as he continued to demand that Gabriel return the coat. Then, as appellant and Gabriel argued over Lewis's coat, appellant pulled out the gun and held it to Gabriel's neck. Gabriel "leaned to the side and ... dropped the coat."

After Gabriel dropped the coat, Lewis started to walk away and left the coat in the street. Appellant and Gabriel continued to argue, however. Lewis heard Gabriel say, "[E]ither one of you guys not going to make it off this block," and saw appellant turn and shoot Gabriel three times. Lewis and appellant immediately ran away in separate directions.

Lewis testified that he had seen appellant with the same handgun three weeks before the shooting, and that he did not know that appellant would bring a gun with him when Lewis called to ask him to come. On cross-examination, Lewis was impeached with his grand jury testimony, in which he denied seeing a gun on the night of the shooting.

### C. The Government's Rebuttal

In the government's rebuttal case, Thomas testified that she was inside when she heard gunshots from her location inside. She looked out the window and saw that Gabriel had been shot. Thomas testified that she saw Lewis leave, while another man, who was "tall[er] and slimm[er]" than Lewis, struggled to stuff something in his coat pocket before he, also, fled the scene of the shooting.

Officer Troy Chestnut testified that he saw Lewis and a tall, slender man wearing an "M & M" jacket, running on opposite

sides of 13th Street and then heading off in different directions.

## II. Aiding and Abetting

### A. The Jury Instruction

██ Appellant argues that the trial judge erred in failing, *sua sponte*, to instruct the jury that to convict appellant on an aiding and abetting theory, it needed to find that he had the same intent required of the principal actor. Appellant contends that the "new *mens rea* principles for aiding and abetting" in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc), *cert denied* 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007),[7] should apply not only to specific-intent crimes, but also to ADW, PFCV, and CPWL. Although we agree that the principles enunciated in *Wilson–Bey* are not limited to so-called "specific intent crimes," *see Wheeler v. United States*, 977 A.2d 973, 986 & n. 34 (D.C.2009) (amended by Order dated January 4, 2010), we conclude that the instruction given here did not constitute plain error.

The parties agree that plain error review applies because the judge's aiding and abetting instruction to the jury was never challenged. To satisfy the plain error standard, appellant must show: (1) "error," (2) that is clear or obvious, and (3) that "affect[s] substantial rights." *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508

(1993)). If all three of those conditions are met, this court "may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (alteration in original) (quoting *Olano*, 507 U.S. at 732, 113 S.Ct. 1770).

In this case, the trial court instructed the jury as follows:

It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed, or that he have intended to commit the particular crime committed by the principal offender.

An aider and abettor is legally responsible for the act[s] of the persons that are the natural and probable consequences of the crime in which he intentionally participates. An aider and abettor is legally responsible for the principal's use of a weapon during an offense if the aider an abettor had actual knowledge that some type of weapon would be used or if it was reasonably foreseeable to the aider and abettor that some type of weapon was required to commit the offense.

This instruction was erroneous as to aiding and abetting the element of possession of PFCV. *See Wheeler*, 977 A.2d at 985–87 (applying *Wilson–Bey* to jury instruction that allowed jury to find defendant guilty of PFCV as the "natural and probable" consequence of another's actions). Be-

---

7. In *Wilson–Bey*, we held that the "natural and probable consequences" language in the aiding and abetting instruction given in that case was erroneous in the context of a premeditated murder charge. *See* 903 A.2d at 830. This is so because the instruction authorized a jury to find a defendant guilty as an accomplice to murder without proof that the defendant himself had the required mental state to commit that crime. Thus, with respect to first-degree premeditated murder, we

held that the prosecution had to prove that the accomplice had the requisite mental state to commit the offense, i.e., specific intent to kill after premeditation and deliberation. *See id.* This holding was necessary to align the District with "the well-established" standard, which demands that an "accomplice be shown to have intended that the principal succeed in committing the charged offense." *Id.* at 831.

cause CPWL also is a "possessory offense," *Lancaster v. United States,* 975 A.2d 168, 174 (D.C.2009), the jury must find that the accomplice had the intent to assist the principal carry the unlicensed weapon. Moreover, these errors are "clear" for purposes of plain error review. *See Johnson,* 520 U.S. at 468, 117 S.Ct. 1544 (explaining special rule for cases where "law at the time of trial was settled and clearly contrary to the law at the time of appeal"). We will assume for present purposes that the trial court's instruction was also obviously incorrect with respect to aiding and abetting ADW.

Nonetheless, we do not think that appellant's "substantial rights" were affected by the erroneous aiding and abetting instruction given in this case. *Olano,* 507 U.S. at 732, 113 S.Ct. 1770. To meet this requirement, appellant must show a "reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez,* 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). We conclude that appellant cannot meet his burden on this record.

Throughout trial, the prosecutor's theory was that appellant, not Lewis, shot Gabriel. It was only in rebuttal, in response to defense counsel's closing argument that appellant had unwittingly carried the gun in the black bag to Lewis, who, according to defense counsel, then shot Gabriel, that the prosecutor argued:

> Now, ladies and gentlemen, defense counsel says look, it comes down to who shot him, who pulled that trigger, Jermaine Spencer or Jowuan Lewis. Well, that is not really right. We know who did it. And we've shown you evidence that Jermaine Spencer was the one who pulled the trigger.

> But, you know what, it is easier for you to make a decision. It's actually much easier.... Basically, if you believe that the defendant brought a gun down there ... he is responsible for the natural consequences of what happened even if he didn't pull the trigger....

> [Y]ou don't have to reach the decision of who actually pulled the trigger under aiding and abetting if you believe that he carried the gun knowingly to that area, you can convict him of murder.

The aiding and abetting theory that the prosecutor espoused in rebuttal was erroneous for the same reason that the instruction was found deficient in *Wilson–Bey,* namely it imposed criminal liability based on "natural and probable" consequences as opposed to the aider's own intent. If we believed that the jury relied on the "natural and probable" consequences language of the instruction or the prosecutor's invocation of that theory in rebuttal to convict appellant of ADW, PFCV or CPWL, we would reverse the convictions and remand the case for a new trial with proper instructions. But the aiding and abetting theory was offered as a fall-back to the government's principal argument that it was appellant who shot Gabriel, and it was specifically directed to the second-degree murder charge, of which appellant was acquitted. Even though the trial judge did not limit the jury's use of the erroneous aiding and abetting instruction to its consideration of only the second-degree murder charge, as appellant concedes, the prosecutor did not press a theory of aiding and abetting liability in presenting its case to the jury with respect to ADW, CPWL or PFCV. Moreover, in making the argument that appellant could be found guilty of aiding and abetting the murder even if he was not the principal, the prosecutor specifically argued that the jury would have to find that appellant had "carried

the gun knowingly." That formulation more than suffices to establish the necessary *mens rea* for CPWL, as appellant himself would have carried the unlicensed weapon. This would also satisfy the possessory element of PFCV, as appellant would have facilitated Lewis's possession of the gun by bringing it to him (on the assumption that the jury believed that it was Lewis, not appellant, who shot Gabriel).

 The remaining question is whether the jury could have been misled by the erroneous aiding and abetting instruction to convict appellant of the assault element of ADW and PFCV (ADW supplying in this case the "crime of violence" component of PFCV) without making all necessary findings with respect to appellant's personal culpability for the crime. We think not. The elements of ADW are: (1) "an attempt, with force or violence, to injure another, or a menacing threat, which may or may not be accompanied by a specific intent to injure;" (2) "the apparent present ability to injure the victim;" (3) a general "intent to commit the acts which constitute the assault;" and (4) "the use of a dangerous weapon in committing the assault." *Williamson v. United States*, 445 A.2d 975, 978–79 (D.C.1982). The first three are elements of simple assault; the fourth turns a simple assault into an assault with a dangerous weapon. *Id.* The jury was properly instructed on the elements of ADW. By acquitting appellant of second-degree murder, the jury rejected the government's theory (based on the testimony of Mitchell and Lewis) that appellant was the shooter. The jury also rejected the prosecutor's legally erroneous fallback argument that it could find appellant guilty of murder if he knowingly took the gun to Lewis. But the jury must have found, as a matter of fact, that appellant knew the gun was in the black bag because

it convicted appellant of CPWL and PFCV, offenses for which the prosecutor did not rely on an aiding and abetting theory. Appellant's knowing facilitation of a gun to Lewis, who appellant knew was in trouble and required assistance, would have persuaded the jury that appellant intended to aid in assaulting Gabriel in order to get Lewis's coat back. In short, we see no reasonable probability that the verdict would have been different if the erroneous aiding and abetting instruction had not been given. As the four-pronged plain error analysis is conjunctive and appellant has not satisfied this third prong, there was no plain error.

### B. The Prosecutor's Rebuttal Argument

 Appellant makes a related claim, that he is entitled to a new trial because the government was unexpectedly allowed to make a new argument during rebuttal, that appellant was not the shooter, but had aided and abetted Lewis in the shooting. "As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel." *Hall v. United States*, 540 A.2d 442, 448 (D.C.1988) (quoting *Moore v. United States*, 120 U.S.App.D.C. 173, 175, 344 F.2d 558, 560 (1965)). "[T]he primary purpose of the rule . . . is to protect defense counsel from surprise." *Id.*

The record does not support appellant's argument that defense counsel was surprised by the prosecutor's rebuttal. Before closing arguments, the government requested an aiding and abetting instruction "[o]n the theory that if [appellant] knew he was bringing a bag or bringing a gun to Fats, and Fats is the actual one who pulls the trigger, he could still be guilty as an aider and abetter for murder even if he didn't know that Fats was going

to actually murder [Gabriel]." Defense counsel agreed to the instruction, saying, "If the government's going to embrace our theory somewhat, I have no problems with that. I'll just make the appropriate argument." Defense counsel did so, arguing not only that appellant did not shoot Gabriel, but also that he did not know there was a gun in the black bag he brought in response to Lewis's calls. Moreover, as we have mentioned, the prosecutor's rebuttal focused on the second-degree murder charge, and appellant was acquitted of that charge.

### III. Exclusion of Grand Jury Transcript

Appellant also challenges the trial court's denial of the deliberating jury's request to see the transcript of Lewis's testimony before the grand jury. After closing arguments, the parties and the trial court discussed what portions of Lewis's grand jury testimony should be admitted as evidence. The trial court denied defense counsel's request to provide the jury with an excerpt of Lewis's grand jury testimony, and excluded the transcript of the testimony, reasoning:

> The fact that you have got a piece of paper doesn't really ... have anything to do with whether this evidence is before the jury or not. It's before the jury. They've heard it, they heard the context, they heard the debate, they heard the direct and cross-examination on the subject. So they've got that evidence. And putting a piece of paper in there doesn't change it. What it does is sort of elevate, contrary to all the other evidence we had.... I think we're better off just leaving [it] out.

The following afternoon, after deliberations had begun, the jurors sent a note to the court that read, "May we have [the] grand jury testimony for Jowuan Lewis[?]" Relying on the rationale discussed during the bench conference, the trial court, over defense objection, refused the jury's request for the transcript of Lewis's grand jury testimony. Defense counsel persisted, and after the jury returned its verdict, counsel filed a motion for new trial based on the trial court's refusal to provide the jury with the transcript. The trial court denied the motion recognizing that exclusion of the transcript had been an error, but finding it harmless. The trial court reasoned that the jury "saw that there was a statement," which counsel had in his hand and used to confront the witness. The trial court also noted that Lewis was not the only witness to the shooting and that the verdict reflected that the jury had "parse[d] out the case[ ] rather carefully." For the reasons that follow, we agree with the trial judge's assessment.

The Supreme Court has established, as both parties agree (and as the trial court recognized in considering the motion for new trial), that the grand jury transcript should have been admitted into evidence and made available to the jury:

> The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction. We hold that the accused is entitled to the application of the rule, not merely because it will emphasize the contradiction to the jury, but because it will best inform them as to the document's impeaching weight and significance.

*Gordon v. United States*, 344 U.S. 414, 421, 73 S.Ct. 369, 97 L.Ed. 447 (1953).[8]

8. We distinguish those cases where we have held that the trial court has discretion on

■ Our review therefore centers on whether the trial court's error in withholding the transcript from the jury was harmless. This analysis depends on the importance of the witness in the context of the case and on whether the jury "was able fully to assess the credibility" of the witness without the transcript. *See Reed v. United States,* 403 A.2d 725, 729 (D.C. 1979). If, for example, the witness's testimony was "not particularly damaging" to the defendant, *(Abraham) Williams v. United States,* 131 U.S.App.D.C. 153, 156, 403 F.2d 176, 178 (1968), or if the improperly excluded evidence was "sufficiently placed before the jury and it was well aware of the existence and content of the prior statement," reversal is unwarranted. *Jefferson v. United States,* 328 A.2d 85, 86 (D.C.1974). But where the trial testimony and prior inconsistent statements were of a key witness, reversal is warranted if the jury was deprived of the ability to "decide for itself how much 'impeaching weight and significance' to give to [the prior] statements." *(Sean) Williams v. United States,* 686 A.2d 552, 556 (D.C.1996) (quoting *Gordon,* 344 U.S. at 421, 73 S.Ct. 369).

There can be no question that Lewis was an important witness. He was at the scene of the shooting and was the only person who directly identified appellant as the shooter. Moreover, he was called by the defense, which argued that it was Lewis who had the motivation to shoot Gabriel and actually did so. We explore the evidence challenging the credibility of Lewis, and whether the jury was made sufficiently aware during in-court examination of the inconsistent statements Lewis made during his grand jury testimony. *See Jefferson,* 328 A.2d at 86. On direct examination, Lewis testified that appellant pulled out a gun from his waistband and shot Gabriel. Defense counsel confronted Lewis with his grand jury testimony, in which he stated, "No, not until—like, I didn't—I really didn't even see the gun the night of the murder. I just heard the shots." Lewis acknowledged that his testimony before the grand jury was a "true statement," but explained it was made in response to a different question than the question asked of him at trial.[9]

Defense counsel also impeached Lewis with four other statements he had made before the grand jury. The first involved his description of Gabriel's actions before he was killed. Before the grand jury, Lewis testified that Gabriel was "being berserk," but at trial he testified that he

---

whether to provide transcripts of *trial* testimony requested by the jury. *See Gardner v. United States,* 898 A.2d 367, 372 (D.C.2006) (stating that trial court has "broad discretion" in deciding whether to provide transcripts of trial testimony requested by the jury). In *Fuller v. United States,* 873 A.2d 1108, 1116 (D.C.2005), we addressed yet a different situation that did not involve a transcript of prior testimony that was used to impeach in-court testimony, but the testimony given during a previous trial by a *defendant* who chose not to take the stand in his second trial. The prior testimony was submitted to the jury and read in full during the second trial. In those circumstances we recognized the risk that the jury might give undue weight to some testimony, in particular if it was the defendant's, because it is available in a transcript form over jurors' recollection of other testimony at trial. 873 A.2d at 1116–17. We said that a "trial judge should first consider whether the jurors have a particular need for the transcript, and if so, give a special instruction cautioning against unduly emphasizing the transcript over other evidence." *Id.* at 1118.

9. On cross-examination, the prosecutor attempted to rehabilitate Lewis by eliciting that the question which preceded Lewis's testimony in the grand jury was, "All right. Any other time that you have seen [appellant with] a gun besides those two times?" At trial, on the other hand, defense counsel had asked, "You [had] seen him with a gun that night," to which Lewis responded "Yes."

did not know what the word "berserk" means. The second statement related to whether Lewis had reached for the gun once he saw it in appellant's hand. At trial, he first denied reaching for the gun, but later on, after defense counsel directed him to the page in the grand jury transcript where he testified that he had reached for the gun in appellant's hand, he acknowledged that he had tried to take the gun from appellant. The third statement referred to what Lewis meant when he testified before the grand jury that after appellant pulled out the gun, he said to appellant, "[T]hat's my coat. Why would you shoot him? . . . Give me the coat-I mean give me the gun and I'll shoot him instead of you shooting him." At trial, Lewis admitted that he had made the statement, but denied that he intended to shoot Gabriel when he reached for the gun appellant held. Rather, he had only wanted to "scare" Gabriel into returning his coat. Finally, at trial Lewis initially denied that he had told Thomas, who had also been accused by Gabriel of stealing his marijuana, that he would "protect" her from Gabriel.[10] When defense counsel referred him to his grand jury testimony, however, Lewis acknowledged that his testimony there had been that he told Thomas, "Ain't nothing going to happen to you while I'm out here."

In considering whether the erroneous exclusion of the transcript of Lewis's inconsistent statements before the grand jury was harmless because the jury was otherwise fully able to assess the credibility of the witness, we have concluded that the trial court's error is harmless, if the prior inconsistent statement had been read in full by the witness to the jury and "was used extensively by defense counsel in . . . cross-examination." Jefferson, 328 A.2d at 86.[11] In this case, unlike in Jefferson, the transcript of Lewis's testimony before the grand jury was not read in full at the trial; rather, defense counsel would impeach aspects of Lewis's trial testimony by referring him to a specific page of the grand jury transcript and reading the specific statement that was inconsistent with Lewis's trial testimony. In each of five instances, counsel established that Lewis had said something different before the grand and petit juries in the case.

In United States v. Smith, 172 U.S.App. D.C. 297, 521 F.2d 957 (1975), the U.S. Court of Appeals for the D.C. Circuit held that the trial court erred in refusing to admit the written report of the police officer who received the complaint of a robbery and the transcript of that officer's subsequent radio broadcasts because the trial court, as here, did not recognize that the evidence was admissible. 172 U.S.App.D.C. at 310, 521 F.2d at 969–70. There, the defendant tried to highlight

---

10. Thomas left before the shooting took place. It is unclear what kind of relationship existed between Lewis and Thomas because it was not developed in her testimony.

11. See, e.g., Robinson v. United States, 756 A.2d 448, 456 (D.C.2000) (holding that because police officer was questioned extensively about her contradictory notes, "the jury had a basis for determining her credibility"); Scott v. United States, 619 A.2d 917, 921 n. 8 (D.C.1993) ("[A]ny error in keeping the documents from the jury was harmless because the jury was made aware through other testimony

'of the existence and content of the prior statement[s].' ") (quoting Jefferson, 328 A.2d at 86) (alteration in original); Reed, 403 A.2d at 729 (noting that, notwithstanding the exclusion of written pretrial statements given by government witnesses, "the jury was able fully to assess the credibility of complainant . . . and the witnesses . . . because the jurors were thoroughly informed of (1) the material omissions from the pretrial statements . . . and (2) the specific discrepancies between the testimony of [the complainant] at trial and his pretrial statement").

inconsistencies between the complaining witness's trial testimony and the police broadcast and report concerning the circumstances surrounding the robbery (when the robbery occurred and where the complaining witness first saw the defendant; whether the defendant had taken money from the complaining witness; and the robber's attire, appearance, and skin color). 172 U.S.App.D.C. at 300, 521 F.2d at 960. The court in *Smith* noted that the report was directly relevant to the credibility of the only witness in the case. *See id.* Although the court recognized that the inconsistencies between the witness's testimony and the prior statements had been fully aired when the witness was questioned at trial, it placed special importance on the jury's request to see the police report, stating:

> [T]he jury's subsequent request for [the] Officer['s] ... report changes the complexion of the issue in this case.... [I]t is the jury, and not this court, that is the trier of fact, and the jury thought the ... [report] was of sufficient importance to ask to see it. We cannot say that visual examination of ... [such report] by the jury would not have affected its verdict.

172 U.S.App.D.C. at 310, 521 F.2d at 970.[12]

We also have recognized the significance of the fact that the jurors requested to see the transcript, because withholding the transcript might have "impeded their ability to perform the task assigned to them," even if the content of the document was presented during trial. *(Sean) Williams,*

686 A.2d at 556. In *(Sean) Williams,* we noted, in particular, that both the prosecutor and defense counsel had "urged the jury to evaluate the importance (or lack thereof) of the statements." *Id.* The witness's testimony bore directly on the critical issue of whether the defendant was in a position to commit the alleged crime,[13] and the jury specifically asked to see the transcripts of the witness's testimony at the defendant's first trial (which resulted in a mistrial). *See id.* at 555.

The importance of Lewis's testimony and the jury's request to see the transcript of his grand jury testimony make this a very close case. Nonetheless, considering the case as a whole and the jury's verdict, we are convinced that the error in not providing the grand jury transcript did not influence the verdict. *See Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (noting that appellate judgment must be rendered in view of the jury's decision). In appellant's trial, many of the facts leading up to the shooting were undisputed: Lewis and Thomas got into an altercation with Gabriel over his "weed," and Gabriel took Lewis's coat; Lewis then called appellant for help several times and appellant responded by coming to Lewis's assistance. At some point, Gabriel was shot. Lewis and appellant disagreed on the source of the gun and on who did the shooting. Appellant said he brought the bag Lewis had given him for safekeeping, but denied that he knew there was a gun in the bag. Lewis denied that he had given a bag to

---

**12.** Because the trial court had discretion, which it had not exercised, the case was remanded so that the trial court could exercise its discretion and consider the jury's request anew. *Id.* If on remand the trial court decided that it "would have exercised its discretion to let the jury see the documents and that its failure to do so was not harmless," a new

trial would be required. 172 U.S.App.D.C. at 311, 521 F.2d at 971.

**13.** The testimony at issue in *(Sean) Williams* referred to whether the witness saw the defendant take the victim to the second level of a house (where the crime took place) and whether the defendant was on that level when the victim screamed. 686 A.2d at 553.

appellant and said that appellant had the gun tucked in his pants. Thomas corroborated Lewis, saying she had not seen a bag. Crucially, appellant and Lewis accused each other of having fired the gun to shoot Gabriel. The question for the jury was who, as between the two of them, was telling the truth. They both testified before the jury, and both had given contradictory statements in the past: Lewis in his grand jury testimony and appellant when he confessed to the police that he had shot Gabriel in self-defense. Defense counsel in closing argument pointed out two specific inconsistencies between Lewis's trial and grand jury testimony,[14] and at least some jurors apparently thought the grand jury testimony was important enough as to request to see the grand jury transcript for themselves after deliberations started. Moreover, as in *(Sean) Williams,* Lewis's grand jury testimony was significant because it not only impeached Lewis's credibility at trial, but it also cast substantive light on his ability and disposition to shoot Gabriel.[15] *See* D.C.Code § 14–102(b) (2001) (prior statement admissible as substantive evidence if declarant is available for cross-examination and statement was made under oath subject to penalty of perjury). Lewis's grand jury testimony that he told appellant "I'll shoot him [Gabriel]," his offer to protect Thomas from Gabriel, and his admission that he tried to grab the gun from appellant, reflect that he had the motive, intent and means to shoot Gabriel. Therefore, the substance of Lewis's grand jury testi-

mony went to the core of appellant's defense that it was Lewis who shot Gabriel.

On the other hand, appellant fled from the shooting, and the next day he attempted to escape from the police officers who tried to stop him and then chased him in their vehicles. However, appellant testified that some of these officers—at least the ones who initiated the chase—were not wearing police uniforms and were driving unmarked police cars and that he thought it was Lewis who was after him. Appellant gave three different accounts: in his first encounter with the police, he denied any knowledge of the shooting; less than twenty-four hours later he confessed but said he shot Gabriel in self-defense; ultimately he recanted his confession, saying he had confessed out of fear, because Lewis had threatened to kill his girlfriend. Unlike in *(Sean) Williams* and *Smith,* however, where the evidence withheld from the jury impeached the *only* witness to the crime, here, there were two other witnesses (Thomas and Mitchell) whose descriptions of the events and the shooter pointed to appellant, albeit indirectly, as between the only two possibilities: Lewis or appellant. Mitchell testified that she was "positive" Lewis was not the shooter because the man who shot Gabriel was "smaller" than Lewis, who was heavy in build, whereas appellant was slender. Thomas similarly testified that she saw Lewis leaving the scene, while another man, who was "tall[er]" and "slim[mer]" than Lewis, struggled to stuff something in his coat pocket before he fled. Al-

14. In closing argument, defense counsel pointed out to the jury that it should not believe Lewis's trial testimony that he did not want to shoot Gabriel, based on his grand jury testimony that he had said to appellant: "I'll shoot him." Defense counsel also argued that Lewis's trial testimony was not credible because he had testified before the grand jury that he had not seen the gun. In total, two out of twenty-three pages of the defense closing argument transcript were dedicated to the inconsistencies between Lewis's trial testimony and what he said before the grand jury.

15. The jury was instructed that it could use Lewis's grand jury testimony as substantive evidence and to impeach his trial testimony.

though Thomas was impeached—she had been drinking and smoking PCP and marijuana, and was Lewis's friend—Mitchell had no apparent reason to lie about what she saw, and it is established that the physical differences between appellant and Lewis were remarkable.

The jury's verdict is critical in our analysis. By acquitting appellant of second-degree murder, the jury obviously rejected Lewis's accusation that appellant was the shooter, and was not sufficiently assured by Mitchell's and Thomas's accounts—nor by appellant's confession, later recanted—that appellant was the tall slim shooter. But by convicting appellant of ADW (and the related weapon offenses) the jurors must have found either that appellant himself threatened Gabriel with the gun before Lewis took it from him and shot Gabriel, or—more likely in light of the defense closing and the prosecutor's rebuttal—that appellant aided Lewis in the assault by knowingly bringing a gun to Lewis. It was undisputed that appellant had responded to Lewis's call for help, and although appellant testified that Lewis had not told him on the phone that he was having a fight with Gabriel, Mitchell testified that she overheard Lewis say on the phone that he was asking for assistance because he had "a beef on 13th [Street]." Appellant testified that in response to the call he brought Lewis's black bag, from which (according to appellant) Lewis took the gun to shoot Gabriel. The inconsistencies between Lewis's testimony before the grand jury and trial did not go to these facts, however, but undermined Lewis's account that appellant shot Gabriel and, at a minimum, created a doubt in the jury's mind that perhaps Lewis was the shooter. In this, the acquittal of second-degree murder shows that the defense successfully impeached Lewis's trial testimony. The jury verdict reveals that jurors dismissed Lewis's testimony that appellant was the shooter, but did not believe appellant's account that he came unarmed to assist Lewis in his confrontation with Gabriel.[16]

16. Even assuming that if the jury had seen the grand jury transcript it would have discredited Lewis's trial testimony even more than the verdict suggests it did, we do not think Lewis's complete impeachment would have led the jury to credit appellant's testimony that he was unaware that the black bag he brought at Lewis's request did not contain a weapon. Appellant testified that he was afraid of Lewis because he had recently seen Lewis respond to a threat by taking a gun out of his pocket. He also testified that at the time of the shooting he was on probation for gun possession and was therefore concerned about not running afoul of the terms of his probation. Nonetheless, he was willing to hold a bag entrusted to him by a drug dealer he knew to be armed, and continued to hold the bag in his home for two to three days after he admittedly knew it contained marijuana. Appellant also testified that even though he had looked into the bag and saw that it was half-full of baggies containing marijuana, he never saw the gun he claimed Lewis extracted from the bag to shoot Gabriel. The bag was described as made of canvas fabric, without a frame, and measured 9″ × 14″; it weighed about two pounds when Lewis handed it to appellant for safekeeping. These facts suggest that the contents of the bag would have been readily ascertainable by manipulating the bag or looking inside it. Moreover, appellant testified that when Lewis called after midnight to ask him to bring the bag, appellant was undressed and in the process of "being intimate" with his girlfriend. From this evidence, the jury reasonably could have inferred that appellant either knew what was in the bag when Lewis handed it to him or became aware of its contents when he had sole possession of it for several days, and realized why Lewis was asking for it when he called. Although it is possible, as appellant testified, that he simply believed that the bag contained marijuana and that Lewis had scored a good deal and needed his drug supply to consummate it, the jury could well have concluded that was not the whole story, because Mitchell testified that Lewis had referred to "a beef." And even if appellant was not aware of Lewis's altercation with Gabriel over the coat, he thought that Lewis needed

Considering the evidence, the inconsistencies between Lewis's testimony at trial and before the grand jury were relatively inconsequential to the jury's ultimate verdict that appellant was guilty of ADW, PFCV and CPWL. We, therefore, are able to conclude with fair assurance that the trial court's error in not providing a transcript of Lewis's grand jury testimony to the jury did not sway the verdict. *Cf. Gordon,* 344 U.S. at 423, 73 S.Ct. 369.

For the foregoing reasons, appellant's convictions for ADW, PFCV, and CPWL are

*Affirmed.*

the gun in connection with a drug transaction. None of these inferences depended on the jury's evaluation of Lewis's trial testimony that appellant took the gun out of his pants to threaten and eventually shoot Gabriel.